Lee Albert (State Bar No. 26231986)
lalbert@glancylaw.com
GLANCY PRONGAY & MURRAY LLP
230 Park Ave, Suite 358
New York, New York 10169
(212) 682-5340

Garth Spencer (*pro hac vice to be filed*)
gspencer@glancylaw.com
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 201-9150

William H. Goodman (*pro hac vice to be filed*)
bgoodman@goodmanhurwitz.com
GOODMAN HURWITZ & JAMES, P.C.
1394 E Jefferson Ave
Detroit, MI 48207
(313) 567-6170

*Attorneys for Plaintiff Richard Goodman
and the Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RICHARD GOODMAN, Individually And As Trustee of the Richard M. Goodman Revocable Living Trust, And On Behalf Of All Others Similarly Situated,<br><br>                Plaintiff,<br>    vs.<br><br>UBS FINANCIAL SERVICES INC.,<br><br>                Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ..........................................................................1

II.     JURISDICTION AND VENUE ....................................................................3

III.    PARTIES .......................................................................................................4

IV.     BACKGROUND ...........................................................................................4

        A.      Defendant UBS and Its Clients ........................................................4

        B.      Taxable Municipal Bonds ................................................................6

        C.      IRS Regulations Regarding Reporting of Amortizable Bond
                Premium ...........................................................................................8

        D.      Defendant's Contracts with and Representations to Its Clients ..........12

                1.      Client Relationship Agreement ..............................................12

                2.      UBS Guide to Form 1099 .......................................................15

                3.      Form 1099s ............................................................................16

        E.      Defendant's Pattern of Incorrect Tax Information Reporting For
                Municipal Bonds ..............................................................................19

V.      DEFENDANT FAILED TO REPORT AMORTIZABLE BOND
        PREMIUM FOR TAXABLE MUNICIPAL BONDS .................................21

        A.      Defendant's Incorrect Reporting to the Class ...................................21

        B.      Defendant's Incorrect Reporting to Plaintiff.....................................23

VI.     DEFENDANT UBS'S ERRONEOUS TAX INFORMATION
        REPORTING INJURED PLAINTIFF AND THE CLASS OF UBS
        CLIENTS .......................................................................................................29

        A.      Harm To Plaintiff and The Class........................................................29

        B.      Defendant Acknowledges the Harm Caused By Incorrect Tax
                Information Reporting ........................................................................31

VII.    CLASS ACTION ALLEGATIONS ..............................................................32

VIII.   CLAIMS FOR RELIEF .................................................................................35

IX.     PRAYER FOR RELIEF .................................................................................42

X.      JURY DEMAND............................................................................................43

Plaintiff Richard Goodman, in his individual capacity and as trustee of the Richard M. Goodman Revocable Living Trust, on behalf of himself and all other persons similarly situated, by his undersigned attorneys, for Plaintiff's complaint against Defendant UBS Financial Services Inc. ("Defendant" or "UBS"), alleges the following based upon personal knowledge as to Plaintiff and his own acts, and information and belief as to all other matters, based upon the investigation conducted by and through Plaintiff's attorneys, which included, *inter alia*, a review of Defendant's public documents, public documents issued by the U.S. Department of the Treasury ("Treasury") and/or the Internal Revenue Service ("IRS"), communications between Defendant and Plaintiff, investigative interviews with a former employee of Defendant, and review of other publicly available information concerning Defendant. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     Defendant UBS, as part of one of the world's largest financial institutions, provides securities brokerage services to its clients. As a necessary part of Defendant's brokerage services, each year Defendant provides tax reporting information to each of its clients, including on IRS Form 1099, so that its clients will have the information required to prepare their income tax returns.

2.     Beginning with the 2014 tax year, Defendant incorrectly reported certain tax information to its clients relating to interest paid on taxable municipal bonds, in violation of clear Treasury Regulations and in violation of Defendant's own representations to its clients regarding its practices and policies for such tax information reporting.

3.     Defendant failed to report amortizable bond premium for taxable municipal bonds as required by applicable Treasury Regulations. Defendant's incorrect tax information reporting to clients had the effect of substantially overstating the clients' taxable income costing money to plaintiff and the Class.

4.     Defendant's incorrect tax information reporting was negligent and in breach of Defendant's contractual and fiduciary duties owed to its clients.

5.     This action is brought by Plaintiff against Defendant on behalf of a Class of all persons in the United States, who on or after January 1, 2014 acquired taxable municipal securities in an account maintained by Defendant, and who received a Form 1099 from Defendant incorrectly reporting the amount of amortizable bond premium, thereby sustaining financial harm as a result.

6.     As a direct result of Defendant's incorrect tax information reporting, Defendant's clients, including Plaintiff and the Class, incurred harm including but not limited to substantial tax overpayments. Based on information and belief, Defendant's wrongful conduct has harmed the Class by at least tens of millions of

dollars. Defendant has admitted, in a series of belatedly "corrected" tax information reporting forms, to overstating Plaintiff's taxable income for the 2015-2018 period by a total of over $100,000.

## II.    JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(d)(2). Members of the proposed Class of plaintiffs are citizens of States different from Defendant. Plaintiff is a citizen of Michigan. Defendant is a corporation incorporated in Delaware. Defendant's principal place of business is located in Weehawken, New Jersey. The number of members of the proposed Class is greater than 100. As of March 31, 2021, Defendant had over 1 million clients. The matter in controversy aggregated across all members of the proposed Class exceeds the sum or value of $5,000,000, exclusive of interest and costs.

8.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367. Plaintiff's claims arise under federal law, as well as state common law. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a). Defendant's failure to comply with federal statutes and regulations (*inter alia*, 26 U.S.C. § 6049, and 26 C.F.R. § 1.6049-9) is central to this action and presents issues that are necessarily raised, actually disputed, substantial, and capable of resolution in federal court without

disrupting the federal-state balance approved by Congress.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District. Defendant's principal place of business is located in this District at 1200 Harbor Boulevard, Weehawken, New Jersey 07086.

## III.   PARTIES

10.    Plaintiff Richard Goodman is a resident of Michigan. Plaintiff is trustee of the Richard M. Goodman Revocable Living Trust (the "Trust"). Plaintiff and the Trust were clients of UBS during the period at issue in this complaint. UBS reported incorrect tax information about Plaintiff and the Trust to Plaintiff and the Trust, and to the IRS, and Plaintiff and the Trust were harmed thereby. Richard Goodman and the Trust are collectively referred to herein as "Plaintiff."

11.    Defendant UBS Financial Services Inc. is a corporation incorporated in Delaware with its principal place of business at 1200 Harbor Boulevard, Weehawken, New Jersey 07086. Defendant's agent for service of process in New Jersey is Corporation Service Company, Princeton South Corporate Center, Suite 160, 100 Charles Ewing Blvd, Ewing, NJ 08628.

## IV.   BACKGROUND

### A.   Defendant UBS and Its Clients

12.    Defendant UBS Financial Services Inc. is an indirect wholly owned subsidiary of UBS Group AG. UBS Group AG, together with its subsidiaries and

affiliates, is one of the world's largest financial institutions. UBS Group AG was founded and is headquartered in Switzerland and has operations around the world. For the calendar year 2020 UBS Group AG reported $6.6 billion in net profits, and $4.2 trillion in invested assets.

13.    Defendant UBS Financial Services Inc. primarily operates as a wealth management firm providing services to clients in the United States. Defendant is registered with the Securities and Exchange Commission ("SEC") as a broker-dealer and investment adviser. Defendant provides clients with investment advisory services, brokerage services, and/or other financial planning services.

14.    Defendant operates throughout the United States and has numerous offices located throughout the United States. As of March 31, 2021, Defendant had over 15,000 employees.

15.    As of March 31, 2021, Defendant had over 1 million clients. The substantial majority (over 95%) of Defendant's clients are individuals. Defendant had 977,565 individual clients, representing over $484 billion in regulatory assets under management as of March 31, 2021.

16.    Defendant had over $572 billion in regulatory assets under management as of March 31, 2021. By December 31, 2020, Defendant categorized approximately 8% of its regulatory assets under management as attributable to U.S. state and local bonds.

17.     According to a March 25, 2013 article published by Bloomberg, *Record Build America Bonds Rally Defies Subsidy Cut: Muni Credit* by Brian Chapatta, UBS Wealth Management oversaw "about $90 billion in local debt" at that time.

18.     Based on information and belief, at all relevant times Defendant's clients have owned tens of billions of dollars' worth of municipal bonds in their UBS accounts.

### B.     Taxable Municipal Bonds

19.     Interest payments on bonds are subject to varying federal, state, and local income tax treatment depending on factors including the issuer of the bonds and the issuer's use of the bond proceeds.

20.     Interest payments from bonds issued by the federal government and its agencies, including Treasury securities, are generally subject to federal income taxes. Interest payments from such bonds are generally exempt from state and local income taxes.

21.     Interest payments from bonds issued by state, city, and local governments (often referred to as municipal bonds, or "munis") are generally free from federal income taxes if the bond proceeds are used for a qualifying governmental purpose (tax-exempt municipal bonds). Interest payments from such bonds are also often free from state and local income taxes in the state or locality

where the bond was issued, subject to exceptions.

22.    Interest payments from municipal bonds are generally subject to federal income taxes if the bond proceeds are used for a purpose that substantially benefits private interests (taxable municipal bonds). Interest payments from such bonds are often free from state and local income taxes in the state or locality where the bond was issued, subject to exceptions.

23.    Large markets exist for the initial issuance (primary market) and post-issuance trading (secondary market) of tax-exempt and taxable municipal bonds.

24.    At all times from 2010 through present the overall size of the municipal bond market has remained relatively stable, in the range of $3.8 trillion to $4.0 trillion principal value of municipal bonds outstanding.

25.    Over the 2011-2018 period, clients of U.S. financial institutions entered over 4 million trades per year on average to purchase municipal bonds. Over this period total client purchases averaged roughly $1.3 trillion par value of such bonds per year.

26.    Over the 2011-2018 period, approximately $350 billion of new municipal bonds were publicly issued each year on average. Over the same period, taxable municipal bonds made up on average 9% of such issuance, or approximately $30 billion per year.

27.    As of 2018, 71% of the $3.8 trillion municipal bond market consisted

of tax-exempt municipal bonds. Taxable municipal bonds where the interest is federally taxable as ordinary income comprised approximately $473 billion, or 12% of the total municipal bond market. The remaining 17%, or $625 billion, of the municipal bond market represented private activity bonds where the interest is subject to the federal Alternative Minimum Tax for individuals.

28.     Based on information and belief, at all relevant times Defendant's clients have owned billions of dollars' worth of taxable municipal bonds in their UBS accounts.

## C.     IRS Regulations Regarding Reporting of Amortizable Bond Premium

29.     Bonds may be purchased at a discount or a premium to their stated principal value. For example, if a bond is issued with a fixed rate of interest payments, and afterwards prevailing market interest rates substantially decline, then all else being equal the bond will trade at a premium to its stated principal value due to the bond's higher interest payments as compared to newly issued securities.

30.     For bonds acquired at a premium, Internal Revenue Code ("IRC") Section 171, 26 U.S.C. § 171, allows the premium to be amortized over the remaining life of the bond to reduce the holder's taxable income. Generally, proportionate amounts of the total bond premium are allowed each year either as a deduction, or as an offset to interest income from the bond. The amount so allowed

is referred to as "amortizable bond premium."

31.    The IRC and Treasury Regulations promulgated thereunder prescribe the way brokers and financial institutions such as Defendant are required to report amounts of amortizable bond premium to their clients.

32.    IRC Section 6049 requires brokers and financial institutions which collect interest payments and transmit them to clients to file information returns with the IRS relating to such interest payments.

33.    IRC Section 6049 also requires brokers and financial institutions to provide written statements to their clients reflecting the information reported to the IRS, "on or before January 31 of the year following the calendar year for which the return . . . was required to be made." These written statements allow individuals to accurately prepare their income tax returns. For most years, federal income tax returns for individuals are due on or about April 15 of the following year.

34.    The written statements brokers provide to clients reflecting interest payments pursuant to IRC Section 6049 are to be made "in such form as the [Treasury] Secretary may prescribe by regulations."

35.    Treasury Regulations promulgated under IRC Section 6049, 26 C.F.R. §§ 1.6049-1 through 1.6049-10, set forth information required to be reported on brokers' information returns and written statements pursuant to IRC Section 6049.

36.    The IRS publishes a form annually with accompanying instructions

for the information returns and client written statements required under IRC Section 6049, Form 1099-INT. Brokers and financial institutions such as Defendant use Form 1099-INT to supply the required information to the IRS and to their clients.

37.    Treasury Regulation 1.6049-9(a) provides in relevant part that, "for a debt instrument acquired on or after January 1, 2014," if a broker is required to provide clients a written statement reporting interest payments pursuant to IRC Section 6049, "the broker generally must report any bond premium."

38.    Treasury Regulation 1.6049-9(b) provides in relevant part:

Unless a broker has been notified in writing in accordance with § 1.6045-1(n)(5) that a customer does not want to amortize bond premium under section 171, the broker must report the amount of any amortizable bond premium allocable to a stated interest payment made to the customer during the calendar year. . . Instead of reporting a gross amount for both stated interest and amortizable bond premium, a broker may report a net amount of stated interest that reflects the offset of the stated interest payment by the amount of amortizable bond premium allocable to the payment.

39.    Box 11, in Form 1099-INT, is labelled "Bond premium. . ."

40.    The 2014 Instructions for Form 1099-INT state in relevant part:

Reporting interest and bond premium. For a covered security acquired with bond premium, you must report the amount of bond premium amortization for the tax year. . .

If you are required to report the amount of bond premium amortization for the tax year, you may report either (1) a net amount of interest that reflects the offset of interest by the amount of bond premium amortization for the year or (2) a gross amount for both the interest and

the bond premium amortization for the year. For example, if a taxpayer receives $20 of taxable interest from a corporate bond and the amount of bond premium amortization for the year is $2, you may report $18 of interest income in box 1 and $0 in box 11, or you may report $20 of interest income in box 1 and $2 in box 11.

41.    The 2014 Instructions for Form 1099-INT further state in relevant part:

> Box 11. Bond Premium
>
> For a taxable covered security acquired at a premium, enter the amount of bond premium amortization for the tax year, unless you were notified in writing that the holder did not want to amortize bond premium under section 171. See Regulations section 1.6045-1(n)(5) and 1.6049-9T(b). . . If you amortized bond premium and reported a net amount of interest in boxes 1, 3, 8, or 9, as applicable, leave this box blank.

42.    Substantially similar instructions for reporting bond premium have been contained in the Form 1099-INT instructions for all years subsequent to 2014.

43.    Treasury Regulation 1.6049-9 was promulgated by Treasury Decision 9713, published March 13, 2015, in the Federal Register (80 F.R. 13233-13239). It was preceded by temporary Treasury Regulation 1.6049-9T, promulgated by Treasury Decision 9616, published April 18, 2013, in the Federal Register (78 F.R. 23116-23134). The temporary regulation was substantially identical to Treasury Regulation 1.6049-9 in all relevant respects.

44.    At all relevant times Treasury Regulations have required brokers to report to their clients the amount of amortizable bond premium attributable to debt instruments acquired on or after January 1, 2014. At all relevant times this

11

requirement has also been reflected in Form 1099-INT and its instructions.

### D.     Defendant's Contracts with and Representations to Its Clients

45.     Based on information and belief, Defendant has had at least hundreds of thousands of clients at all relevant times and has employed standardized form documents to communicate with and to define its contractual relations with its clients. The terms of Defendant's communications and contracts with its clients are uniform as to each client in all relevant respects, as described below.

46.     Defendant is the sole drafter of its adhesion contracts with its clients. Defendant's clients have no opportunity to change or negotiate the terms of these standardized form contracts. Defendant, as a part of one of the world's largest financial institutions, is in a position of power and authority in its relations with its clients.

### 1.     Client Relationship Agreement

47.     Throughout the relevant period, Defendant has posted copies of certain of its form contracts for clients on its publicly accessible website. For much of the relevant period certain of these contracts were publicly available at the URL http://www.ubs.com/us/en/wealth/misc/AccountDisclosures.html.

48.     The Internet Archive Wayback Machine ("Internet Archive") is a public, online archive of web pages, which stores versions of web pages as they existed at particular points in time. The Internet Archive currently contains

approximately 475 billion web pages.

49.     On March 26, 2014, the Internet Archive captured the version of the UBS Client Relationship Agreement then available on UBS's public website.

50.     The Client Relationship Agreement describes the scope of the contractual relationship between Defendant and its clients as follows:

> Known as the Client Relationship Agreement, this document outlines the terms and conditions of your relationship with us. By maintaining your Accounts at UBS, you agree to these terms and conditions and the other agreements and disclosures we refer to here.

51.     Therefore, the Client Relationship Agreement ("Agreement") constituted a contract between Defendant and its clients.

52.     The Agreement further describes the scope of the contractual relationship between Defendant and its clients:

> We refer to the Client Relationship Agreement together with all other agreements and disclosures that we make available to you, and any amendments, as our "Agreement" with you.

53.     Therefore, "all other agreements and disclosures" that Defendant made available to its clients, "and any amendments," also constituted contracts between Defendant and its clients.

54.     The scope of the contractual relationship between Defendant and its clients is described as follows:

> This Client Relationship Agreement and the related documents, including the General Terms and Conditions and the rest of the Agreements and Disclosures booklet form the entire "Agreement"

between you and us with respect to your account(s). This Agreement supersedes any prior representations or agreements.

The accounts and services we offer may change over time. We may change our Agreement with you at any time by sending you a written notice of the change, and the changes will be effective on the date of the notice unless we specify a later date. We also may cease to offer services at any time without prior notice. Your continued use of your Accounts and our products and services constitutes your acceptance of the new terms and conditions. All changes by you to the Agreement will become effective only if offered in writing and signed by us.

55.     Therefore, any "written notice" sent by Defendant to its clients constituted a contract between Defendant and its clients.

56.     The Client Relationship Agreement expressly contemplates that Defendant will provide the client with 1099s, by stating:

UBS offers certain communications through electronic delivery. Categories of communications you may enroll in for e-Delivery include: . . . Tax reporting documents, including 1099s and other tax documents that are available now or become available in the future.

57.     Therefore, tax reporting documents, including 1099s and Defendant's guides to Form 1099, sent by Defendant to its clients also constitute contracts or contractual modifications that govern the contractual relationship between UBS and its clients.

58.     Additionally, The Client Relationship Agreement provides that the Agreement "is governed by the laws of the State of New York, without giving effect to such State's choice of law or conflict of laws provisions." This provision applies to the choice of substantive law applicable to the instant action. This

14

provision does not affect the choice of procedural law applicable to the instant action.

59.     Based on information and belief, all versions of Defendant's Client Relationship Agreement in effect during the relevant period contained language substantively similar to the language from the Client Relationship Agreement version archived by the Internet Archive Wayback Machine on March 26, 2014, as quoted above.

### 2.     UBS Guide to Form 1099

60.     Each year Defendant provides its clients with a consolidated IRS Form 1099, including Form 1099-INT. Defendant also provides its clients with a guide to Defendant's consolidated IRS Form 1099. The guide is a standardized document that is uniform across all of Defendant's clients.

61.     For example, for the 2017 tax year Defendant published "A guide to your 2017 Consolidated IRS Form 1099."

62.     The 2017 UBS guide to Form 1099 stated, *inter alia*:

This comprehensive reference guide is designed to help you in filing your federal income tax return. It provides detailed explanations and examples of the tax reporting statement you may receive, depending on the type of reportable income you have in your account.

The Consolidated Form 1099 reflects information that is reported to the Internal Revenue Service (IRS). In most situations, you must report the income shown on Form 1099 when filing your federal income tax return.

63.     Under the heading "Form 1099-INT, Interest Income" the 2017 UBS

guide to Form 1099 further stated:

> For a covered security acquired at premium, unless you notified UBS in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to amortize the premium under section 171, we will report a gross amount for both the interest paid to you and the premium amortization for the year.

64.    Regarding Form 1099-INT, under the sub-heading "Box 11. Bond Premium" the 2017 UBS guide to Form 1099 further stated:

> For a taxable covered security (other than a U.S. Treasury obligation), Box 11 shows the amount of premium amortization allocable to interest payment(s) for the year, unless you notified UBS in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to amortize the bond premium under section 171. . . If an amount is not reported in this box for a covered security acquired at a premium and UBS is reporting premium amortization, then we have reported a net amount of interest in Boxes 1.

65.    Thus, Defendant represented to its clients that it would, and so was contractually obligated to, properly report any amortizable bond premium to its clients on its Forms 1099.

66.    Based on information and belief, all versions of Defendant's guides to Form 1099 in effect during the relevant period have contained language substantively similar to the language from the 2017 Form 1099 guide as quoted in this Complaint.

### 3.    Form 1099s

67.    Each year Defendant sends its clients a consolidated Form 1099, including Form 1099-INT, reflecting tax information reported to the IRS, which is

16

supposed to aid the clients in fulfilling their own tax filing obligations.

68.    Specifically, Defendant sent Plaintiff a 2017 consolidated Form 1099, dated February 28, 2018.

69.    The 2017 consolidated Form 1099 sent to Plaintiff directed Plaintiff to Defendant's guide to the consolidated Form 1099 via a link to Defendant's website.

70.    In the 2017 consolidated Form 1099 sent to Plaintiff, under the heading "Summary Information" and the sub-heading "INTEREST INCOME 2017 1099-INT" stated, "This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported." Directly under this warning, Defendant reported an amount for "Interest Income" (Box 1), and an amount for "Bond premium" (Box 11).

71.    The 2017 consolidated Form 1099 sent to Plaintiff, under the heading "Detail for Interest Income" stated, "This section of your tax information statement contains the payment level detail of taxable interest and associated bond premium. . . Bond premium and market discount for covered tax lots are totaled on Form 1099-INT and reported to the IRS."

72.    The 2017 consolidated Form 1099 sent to Plaintiff, under the heading

17

"Instructions for Recipient" and the sub-heading "1099-INT Instructions for Recipient" stated:

> For a taxable covered security acquired at a premium, unless you notified the payer in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to amortize the premium under section 171, or for a tax-exempt covered security acquired at a premium, your payer generally must report either (1) a net amount of interest that reflects the offset of the amount of interest paid to you by the amount of premium amortization allocable to the payment(s), or (2) a gross amount for both the interest paid to you and the premium amortization allocable to the payment(s).

73.     The 2017 consolidated Form 1099 sent to Plaintiff, under the heading "Instructions for Recipient" and the sub-heading "1099-INT Instructions for Recipient" further stated:

> Line 11. For a taxable covered security (other than a U.S. Treasury obligation), shows the amount of premium amortization allocable to the interest payment(s), unless you notified the payer in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to amortize bond premium under section 171. . . If an amount is not reported on this line for a taxable covered security acquired at a premium and the payer is reporting premium amortization, the payer has reported a net amount of interest on line 1.

74.     Therefore, Defendant represented to Plaintiff that it would, and so was contractually obligated to, properly report any amortizable bond premium to Plaintiff on its Form 1099.

75.     Based on information and belief, all versions of Defendant's Form 1099 sent to each of its clients for each year during the relevant period have contained language substantively similar to the language from the 2017 Form 1099

sent to Plaintiff as quoted in this Complaint.

**E.     Defendant's Pattern of Incorrect Tax Information Reporting For Municipal Bonds**

76.     Defendant has a history of misreporting tax information to its clients relating to municipal bonds. This indicates that Defendant suffers from firm-wide deficiencies relating to its policies and procedures for tax information reporting as relates to municipal bonds. Based on information and belief, such deficiencies materially contributed to Defendant's failure to correctly report amortizable bond premium to Plaintiff and the Class.

77.     The Financial Industry Regulatory Authority ("FINRA") is a self-regulatory organization which regulates member brokerage firms. Defendant is a FINRA member and regulated by FINRA.

78.     In a FINRA Letter of Acceptance, Waiver and Consent No. 2014041645601, accepted by FINRA on August 12, 2015 (the "2015 AWC"), Defendant accepted and consented to the findings by FINRA, *inter alia,* those discussed below.

79.     In the 2015 AWC, FINRA found that:

From July 2009 through December 2013 . . . UBS failed to reasonably supervise and to have an adequate supervisory system, including adequate written supervisory procedures, to address short positions in tax-exempt municipal bonds that resulted primarily from trading errors at the Firm's retail branches. As a result of these supervisory failures, UBS inaccurately represented to approximately 4,371 customers that at least $1,165,000 in interest that the Firm paid to

those customers was exempt from taxation.

80.    FINRA further found that, "the tax reporting system used by UBS relied on coding from the Firm's automated income processing system to determine whether interest would be reported as taxable or tax-exempt," and that as a result of systematic miscoding relating to municipal bond interest, "UBS sent inaccurate Forms 1099 to customers who received firm-paid interest for calendar years 2009 through 2012."

81.    In the 2015 AWC, Defendant consented to a censure and a fine of $750,000.

82.    In a FINRA Letter of Acceptance, Waiver and Consent No. 2016050874301, accepted by FINRA on October 2, 2019 (the "2019 AWC"), Defendant accepted and consented to the findings by FINRA, *inter alia*, those discussed below.

83.    In the 2019 AWC, FINRA found that:

After UBS's 2015 AWC, between August 13, 2015 and at least December 31, 2017, UBS continued to fail to establish and maintain reasonably designed supervisory systems and written supervisory procedures to address short positions in tax-exempt municipal securities. As a result, the Firm failed to take action to address the tax consequences of certain short positions in municipal securities. . .

Because of these failures, UBS: (i) inaccurately represented that approximately 2,853 municipal bond positions on customer account statements and Forms 1099 had received approximately $261,610 in interest that was tax-exempt, and (ii) inaccurately represented on approximately 950 additional customer account statements and Forms

1099 that they had received taxable interest, when in fact some or all of the interest was exempt from taxation.

84.     Additionally, the 2019 AWC stated that "[b]etween January 2014 and the August 2015 AWC, UBS made misstatements to customers holding an additional 1,836 municipal bond positions that approximately $306,202 in interest they had received was tax-exempt."

85.     In the 2019 AWC, Defendant consented to a censure and a fine of $2,000,000.

## V.   DEFENDANT FAILED TO REPORT AMORTIZABLE BOND PREMIUM FOR TAXABLE MUNICIPAL BONDS

### A.   Defendant's Incorrect Reporting to the Class

86.     In violation of applicable Treasury Regulations, IRS guidance, and Defendant's own representations and promises to its clients, Defendant did not report amortizable bond premium for taxable municipal bonds in Forms 1099 sent to Plaintiff and Class members and the IRS. Defendant reported only the gross amount of interest attributable to taxable municipal bonds, without reducing this by appropriate amounts of amortizable bond premium, and without separately stating the appropriate amounts of amortizable bond premium. As a direct result, Defendant substantially overstated the amounts of taxable income attributable to Plaintiff and Class members from their taxable municipal bonds.

87.     Defendant's failure to report amortizable bond premium with respect to taxable municipal bonds appears to have been a systematic failure with respect

to all of Defendant's clients.

88.     From prior to 2014 through at least 2020 Plaintiff was a client of Defendant. During this period, Defendant's employee serving as Plaintiff's financial advisor was Brian Edgar. Brian Edgar was employed by Defendant as a financial advisor working out of Defendant's Birmingham, Michigan office from May 2008 through September 2020. In the course of investigating Plaintiff's claims against Defendant, Plaintiff's counsel conducted investigative interviews with Defendant's former employee, Mr. Edgar.

89.     During Mr. Edgar's work for Defendant, he observed that Defendant failed to correctly report amortizable bond premium for multiple taxable municipal bonds owned by multiple clients with whom Mr. Edgar worked, including Plaintiff.

90.     Upon further investigation, Mr. Edgar observed that Defendant failed to correctly report amortizable bond premium for all taxable municipal bonds for all clients that he checked.

91.     Beginning in or about 2016 and continuing over multiple years, Mr. Edgar notified numerous of Defendant's employees of this problem to attempt to have Defendant correct it.

92.     Among Defendant's personnel whom Mr. Edgar notified of the incorrect tax reporting were: his director, his compliance manager, senior

22

management, the municipal bond trading group, the municipal bond underwriting group, and the tax group.

93.     Mr. Edgar eventually prevailed on Defendant to issue amended Forms 1099 to certain clients with whom Mr. Edgar worked, including Plaintiff. When Mr. Edgar inquired whether the incorrect reporting would be fixed on a firm-wide basis he was informed that Defendant did not plan to issue corrected Forms 1099 on a firm-wide basis, but to only to deal with the issue for specific client accounts if a client or their financial adviser happened to raise the issue with Defendant.

### B.     Defendant's Incorrect Reporting to Plaintiff

94.     In 2014 Plaintiff acquired, in a UBS brokerage account, taxable municipal bonds in the secondary market at a premium that were (i) issued by the State of Michigan and identified by CUSIP number 5946105T0 ("Michigan Bonds"), and (ii) issued by the Texas Public Finance Authority and identified by CUSIP number 882722KD2 ("Texas Bonds").

95.     Defendant issued to Plaintiff a 2015 Consolidated Form 1099 dated February 26, 2016. This form inappropriately reported $19,062.50 of interest for the Michigan Bonds and no related amortizable bond premium. This represented the gross amount of interest paid on the Michigan Bonds. This form also inappropriately reported $24,288.00 of interest for the Texas Bonds and no related amortizable bond premium. This represented the gross amount of interest paid on

the Texas Bonds. Defendant's tax information reporting on the 2015 Consolidated Form 1099 incorrectly overstated Plaintiff's taxable income. The Form 1099 should have included amortizable bond premium for the Michigan Bonds and the Texas Bonds.

96.     Defendant issued to Plaintiff a 2016 Consolidated Form 1099 dated February 27, 2017. This form inappropriately reported $19,062.50 of interest for the Michigan Bonds and no related amortizable bond premium. This represented the gross amount of interest paid on the Michigan Bonds. This form also inappropriately reported $24,288.00 of interest for the Texas Bonds and no related amortizable bond premium. This represented the gross amount of interest paid on the Texas Bonds. Defendant's tax information reporting on the 2016 Consolidated Form 1099 incorrectly overstated Plaintiff's taxable income. The Form 1099 should have included amortizable bond premium for the Michigan Bonds and the Texas Bonds.

97.     Defendant issued to Plaintiff a 2017 Consolidated Form 1099 dated February 28, 2018. This form inappropriately reported $19,062.50 of interest for the Michigan Bonds and no related amortizable bond premium. This represented the gross amount of interest paid on the Michigan Bonds. This form also inappropriately reported $24,288.00 of interest for the Texas Bonds and no related amortizable bond premium. This represented the gross amount of interest paid on

the Texas Bonds. Defendant's tax information reporting on the 2017 Consolidated Form 1099 incorrectly overstated Plaintiff's taxable income. The Form 1099 should have included amortizable bond premium for the Michigan Bonds and the Texas Bonds.

98.     Defendant issued to Plaintiff a 2018 Consolidated Form 1099 dated February 28, 2019. This form inappropriately reported $19,062.50 of interest for the Michigan Bonds and no related amortizable bond premium. This represented the gross amount of interest paid on the Michigan Bonds. This form also inappropriately reported $24,288.00 of interest for the Texas Bonds and no related amortizable bond premium. This represented the gross amount of interest paid on the Texas Bonds. Defendant's tax information reporting on the 2018 Consolidated Form 1099 incorrectly overstated Plaintiff's taxable income. The Form 1099 should have included amortizable bond premium for the Michigan Bonds and the Texas Bonds.

99.     Later in 2019, Mr. Edgar finally succeeded in causing Defendant to take partial, yet far from sufficient, remedial measures relating to its erroneous tax information reporting, at least as relates to Plaintiff. As a result of Mr. Edgar's repeated attempts to have Defendant address its errors, Defendant belatedly issued a series of revised Form 1099s to Plaintiff.

100.   Defendant issued to Plaintiff a "corrected" 2015 Consolidated Form

1099 dated September 6, 2019. This form reported a positive amount (i.e. increasing taxable income) of $12,951.99 of bond premium for the Michigan Bonds, and a positive amount of $12,761.45 of bond premium for the Texas Bonds. However, this "corrected" form 1099 was still inaccurate, because the bond premium should have been reported as a negative number reducing taxable income. Defendant then issued to Plaintiff a second "corrected" 2015 Consolidated Form 1099 dated September 26, 2019 reflecting a negative amount of $12,951.99 of bond premium for the Michigan Bonds, and a negative amount of $12,761.45 of bond premium for the Texas Bonds. Defendant thereby admitted that it had overstated Plaintiff's taxable income in the original 2015 Form 1099 by $25,713.44, and that it had overstated Plaintiff's taxable income in the first "corrected" 2015 Form 1099 by $51,426.88.

101.   Defendant issued to Plaintiff a "corrected" 2016 Consolidated Form 1099 dated September 6, 2019. This form reported a positive amount (*i.e.* increasing taxable income) of $14,387.20 of bond premium for the Michigan Bonds, and a positive amount of $15,278.07 of bond premium for the Texas Bonds. However, this "corrected" form 1099 was still inaccurate, because the bond premium should have been reported as a negative number reducing taxable income. Defendant then issued to Plaintiff a second "corrected" 2016 Consolidated Form 1099 dated September 26, 2019 reflecting a negative amount of $14,387.20

of bond premium for the Michigan Bonds, and a negative amount of $15,278.07 of bond premium for the Texas Bonds. Defendant thereby admitted that it had overstated Plaintiff's taxable income in the original 2016 Form 1099 by $29,665.27, and that it had overstated Plaintiff's taxable income in the first "corrected" 2016 Form 1099 by $59,330.54.

102.   Defendant issued to Plaintiff a "corrected" 2017 Consolidated Form 1099 dated September 6, 2019. This form reported a positive amount (*i.e.* increasing taxable income) of $14,619.85 of bond premium for the Michigan Bonds, and a positive amount of $15,579.35 of bond premium for the Texas Bonds. However, this "corrected" form 1099 was still inaccurate, because the bond premium should have been reported as a negative number reducing taxable income. Defendant then issued to Plaintiff with a second "corrected" 2017 Consolidated Form 1099 dated September 26, 2019 reflecting a negative amount of $14,619.85 of bond premium for the Michigan Bonds, and a negative amount of $15,579.35 of bond premium for the Texas Bonds. Defendant thereby admitted that it had overstated Plaintiff's taxable income in the original 2017 Form 1099 by $30,199.20, and that it had overstated Plaintiff's taxable income in the first "corrected" 2017 Form 1099 by $60,398.40.

103.   Defendant issued to Plaintiff a "corrected" 2018 Consolidated Form 1099 dated September 6, 2019. This form reported a positive amount (*i.e.*

increasing taxable income) of $14,856.26 of bond premium for the Michigan Bonds, and a negative amount of $15,886.57 of bond premium for the Texas Bonds. However, this "corrected" form 1099 was still inaccurate, because the bond premium for the Michigan Bonds should have been reported as a negative number reducing taxable income. Defendant then issued to Plaintiff a second "corrected" 2018 Consolidated Form 1099 dated September 30, 2019 reflecting a negative amount of $14,856.26 of bond premium for the Michigan Bonds, and a negative amount of $15,886.57 of bond premium for the Texas Bonds. Defendant thereby admitted that it had overstated Plaintiff's taxable income in the original 2018 Form 1099 by $14,856.26, and that it had overstated Plaintiff's taxable income in the first "corrected" 2018 Form 1099 by $29,712.52.

104.   In sum, through its "corrected" Forms 1099, Defendant admitted that over the 2015-2018 tax years, it had overstated Plaintiff's taxable income by $100,434.17, based on the amounts reported in the original Forms 1099 sent to Plaintiff for each tax year. In the "corrected" Forms 1099 Defendant sent to Plaintiff dated September 6, 2019, Defendant compounded this error, overstating Plaintiff's taxable income by $200,868.34 for the 2015-2018 period.

## VI.   DEFENDANT UBS'S ERRONEOUS TAX INFORMATION REPORTING INJURED PLAINTIFF AND THE CLASS OF UBS CLIENTS

### A.   Harm To Plaintiff and The Class

105.   Based on information and belief, based in part on the facts alleged *supra* in Part V, Defendant provided members of the Class nationwide with erroneous and incorrect form 1099s, in a uniform Class-wide manner.

106.   Plaintiff filed his federal income tax returns for each of the 2015-2018 tax years using the information reported to him on the original Form 1099s provided to him by Defendant for each year. Plaintiff therefore over-reported his taxable income by a total of $100,434.17 over this period and made substantial federal income tax overpayments as a result.

107.   Many clients of Defendant with whom Mr. Edgar worked, had their taxable income over-reported by tens or hundreds of thousands of dollars as a result of Defendant's incorrect reporting of amortizable bond premium for taxable municipal bonds. Based on information and belief, many other clients of Defendant nationwide also had their taxable income over-reported by substantial amounts as a result of Defendant's incorrect reporting of amortizable bond premium for taxable municipal bonds.

108.   Like Plaintiff, many Class members were harmed by making tax overpayments because of Defendant's incorrect reporting of amortizable bond

premium. Based on information and belief, there are at least hundreds of such Class members nationwide.

109.   Based on information and belief, Defendant's incorrect reporting of amortizable bond premium also harmed Class members nationwide by causing them to receive smaller tax refunds than they were otherwise entitled to, similarly because of overstating their taxable income.

110.   Based on information and belief, Defendant's incorrect reporting of amortizable bond premium also harmed Class members by causing them to incur unnecessary expense such as professional fees for tax return preparation and advice relating to Defendant's misreporting of amortizable bond premium, including in relation to original tax returns, amended returns, and/or IRS audits. If a taxpayer files their taxes using different information than that reported to the IRS by a broker on Form 1099, this significantly increases the risk that the taxpayer will be subject to an IRS audit.

111.   Tax advice and return preparation fees in connection with the filing of an amended return can cost tens of thousands of dollars or more for complex returns. Tax advice and related fees in connection with an IRS audit can cost tens of thousands of dollars or more.

112.   Even if a Class member eventually corrected UBS's misreporting of amortizable bond premium, such a Class member was also harmed by loss of the

time-value of the initially overpaid or under-refunded amounts, in addition to any professional fees incurred.

113.   For some of the tax years at issue it is no longer possible for Class members to amend their returns to claim refunds or credits. Under IRC Section 6511, a taxpayer must file a claim for a credit or refund of a tax overpayment "within 3 years from the time the return was filed or 2 years from the time the tax was paid."

### B.   Defendant Acknowledges the Harm Caused By Incorrect Tax Information Reporting

114.   Defendant has implicitly acknowledged, as evidenced by the 2015 AWC and the 2019 AWC, that Defendant's incorrect tax information reporting with respect to municipal securities may harm its clients by (i) causing them to pay unnecessary taxes, (ii) causing them to incur costs to amend tax returns, and (iii) depriving clients of the time-value of their unnecessarily expended funds.

115.   In the 2015 AWC, FINRA found that after Defendant learned of the incorrect tax information reporting at issue in the 2015 AWC, Defendant "made makeup payments to customers to account for the associated increase in tax liability. UBS has agreed in principal with the IRS to make a payment to relieve its customers of the burden of filing amended tax returns and paying additional federal income tax."

116.   In the 2019 AWC Defendant agreed to:

certify in writing to FINRA that it has taken good faith steps, including communicating with the IRS, to make a payment to the IRS to relieve UBS's customers of the burden of filing amended federal tax returns and paying additional federal income tax owed for tax years 2014-2017 resulting from the municipal short positions maintained by the Firm during that period, including by making a payment to the IRS on behalf of the customers.

117.   In the 2019 AWC Defendant further agreed to "provide restitution sufficient to compensate its customers who may have incurred increased state tax liabilities resulting from UBS having mischaracterized interest accrued between 2014 and 2017 as taxable substitute interest," and that each such client would "receive restitution, plus interest."

118.   As evidenced by the 2015 AWC and the 2019 AWC, Defendant had erroneous and deficient tax information reporting relating to municipal bonds, and Defendant was aware of these errors and deficiencies during the relevant period. Like the errors and deficiencies acknowledged by Defendant in the 2015 AWC and the 2019 AWC, Defendant's tax information reporting relating to amortizable bond premium for taxable municipal bonds was likewise erroneous and deficient.

## VII.   CLASS ACTION ALLEGATIONS

119.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of:

All persons in the United States, who on or after January 1, 2014 acquired taxable municipal securities in an account maintained by Defendant, and who received a Form 1099 from Defendant incorrectly reporting the amount of amortizable bond premium, thereby

sustaining financial harm as a result.

Excluded from the Class are Defendant, its officers and directors, and the heirs, successors or assigns of the foregoing, and any entity in which Defendant has or had a controlling interest.

120.  The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Defendant would have a record of each member of the class who was issued an incorrect Form 1099 by Defendant. Plaintiff believes that there are at least hundreds of members in the Class. As of March 31, 2021 Defendant had over 1 million clients.

121.  Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendant's wrongful conduct complained of herein.

122.  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation. Plaintiff has no interest antagonistic to or in conflict with those of the Class.

123.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether Defendant misreported amortizable bond premium on Form 1099 in violation of Treasury Regulations;

- whether Defendant acted negligently by misreporting amortizable bond premium on Form 1099s it issued;

- whether Defendant represented to the Class that it would correctly report amortizable bond premium;

- whether Defendant owed the Class a fiduciary duty of care;

- whether Defendant violated its fiduciary duty of care to the Class by misreporting amortizable bond premium on its Form 1099s;

- whether Defendant breached its contracts with Class members by misreporting amortizable bond premium on its Form 1099s;

- whether Defendant breached the implied covenant of good faith and fair dealing in its contracts with Class members by misreporting amortizable bond premium on its Form 1099s;

- whether the members of the Class have sustained damages, and if so, what is the proper measure of damages;

- whether the substantive law of the State of New York is applicable to the nationwide Class, pursuant to the choice of law provision included in the Client Relationship Agreement by Defendant.

124.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small in comparison to the cost of litigation, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII.  CLAIMS FOR RELIEF

### Count I
### Breach of Contract

125.  Plaintiff hereby repeats, realleges, and incorporates each and every allegation contained in the above paragraphs of the Complaint as though fully set forth herein.

126.  Defendant, Plaintiff and the Class entered into valid and binding written contracts, the terms of which were supplied by, *inter alia*, the UBS Client Relationship Agreement, with the Plaintiff and members of the Class, and Defendant's guides to Form 1099, and Defendant's Forms 1099.

127.  Plaintiff and the members of the Class have fully performed their obligations under their contracts with Defendant.

128.  Defendant has breached various provisions of its contracts with Plaintiff and the members of the Class, including but not limited to the portions of those contracts quoted herein relating to Defendant's tax information reporting of amortizable bond premium.

129.  As a result of Defendant's breaches of contract, Plaintiff and the members of the Class have sustained substantial damages, including but not limited to overpayment of federal income taxes.

### Count II
### Breach of the Implied Covenant of Good Faith and Fair Dealing

130.  Plaintiff hereby repeats, realleges, and incorporates each and every

allegation contained in the above paragraphs of the Complaint as though fully set forth herein.

131.   Defendant, Plaintiff and the members of the Class entered into valid and binding written contracts, the terms of which were supplied by, *inter alia*, Defendant's Client Relationship Agreement, Defendant's guides to Form 1099, and Defendant's Forms 1099.

132.   There exists in every contract an implied covenant of good faith and fair dealing wherein the contracting parties will not conduct themselves in a way which will have the effect of preventing the other party from receiving the full and complete benefits of the contract or injuring the other party.

133.   A reasonable person in the position of Plaintiff and the members of the Class would be justified in understanding that Defendant promised to provide them with accurate tax information reporting, and to promptly and fully correct any prior erroneous tax information reporting upon learning of the error.

134.   Plaintiff and the members of the Class have fully performed their obligations under their contracts with Defendant, and have at all times acted in accord with the implied covenant of good faith and fair dealing.

135.   Defendant has breached the implied covenant of good faith and fair dealing in that Defendant failed to provide accurate tax information reporting to Plaintiff and the members of the Class, and failed to promptly and fully correct its

prior erroneous tax information reporting upon learning of the error.

136.   As a result of Defendant's breaches of the covenant of good faith and fair dealing, Plaintiff and the members of the Class have sustained substantial damages, including but not limited to overpayment of federal income taxes.

**Count III**
**Breach of Fiduciary Duty**

137.   Plaintiff hereby repeats, realleges, and incorporates each and every allegation contained in the above paragraphs of the Complaint as though fully set forth herein.

138.   There exists a special relationship between Plaintiff and the members of the Class, and the Defendant  whereby Defendant exercised control over the tax information reporting for its clients' accounts, and the clients acted in reliance on Defendant in matters of tax information reporting. Defendant is in a superior position to its clients who place a high level of trust and confidence in Defendant in matters of tax information reporting.

139.   Defendant has special knowledge regarding the tax information of Plaintiff and the members of the Class relating to securities owned in their accounts, due to Defendant's role as their securities broker. Defendant understands that Plaintiff and the Class rely on the tax information provided by Defendant with respect to securities owned in their accounts.

140.   Defendant's fiduciary duty to Plaintiff and the Class encompasses a

duty of care, which requires Defendant to perform tax information reporting for its clients in a reasonable and prudent manner, and to promptly and fully correct any prior erroneous tax information reporting upon learning of the error.

141.   Defendant has breached its fiduciary duty to Plaintiff and the Class in that Defendant failed to provide accurate tax information reporting, and failed to promptly and fully correct its prior erroneous tax information reporting upon learning of the error.

142.   As a result of Defendant's breaches of fiduciary duty, Plaintiff and the Class have sustained substantial damages, including but not limited to overpayment of federal income taxes.

**Count IV**
**Negligent Misrepresentation**

143.   Plaintiff hereby repeats, realleges, and incorporates each and every allegation contained in the above paragraphs of the Complaint as though fully set forth herein.

144.   There existed a special relationship between the Plaintiff and members of the Class, and the Defendant whereby Defendant exercised control over the tax information reporting for its clients' accounts, and the Plaintiff and members of the Class acted in reliance on Defendant in matters of tax information reporting. Defendant is in a superior position to its clients who place a high level of trust and confidence in Defendant in matters of tax information reporting.

145.   Defendant had a duty to provide correct tax information reporting to Plaintiff and members of the Class, and to promptly and fully correct any prior erroneous tax information reporting upon learning of the error.

146.   Defendant has negligently made incorrect statements to Plaintiff and members of the Class, including on Forms 1099 and in Defendant's guides to Form 1099, regarding Defendant's practices for reporting amortizable bond premium and regarding the amounts of amortizable bond premium attributable to Plaintiff and members of the Class.

147.   Plaintiff and members of the Class reasonably relied on Defendant's incorrect statements when incorporating incorrect information provided by Defendant into their income tax returns.

148.   As a result of Defendant's negligent misrepresentations, Plaintiff and members of the Class have sustained substantial damages, including but not limited to overpayment of federal income taxes.

**Count V**
**Negligence**

149.   Plaintiff hereby repeats, realleges, and incorporates each and every allegation contained in the above paragraphs of the Complaint as though fully set forth herein.

150.   Defendant owed Plaintiff and members of the Class a duty to act as a reasonably prudent broker when providing tax information reporting relating to its

clients' accounts, including by promptly and fully correcting any prior erroneous tax information reporting upon learning of the error.

151.   Defendant has breached its duty to Plaintiff and the members of the Class in that Defendant failed to provide accurate tax information reporting to Plaintiff and the Class, and failed to promptly and fully correct its prior erroneous tax information reporting upon learning of the error.

152.   As a result of Defendant's negligence, Plaintiff and the members of the Class have sustained substantial damages, including but not limited to overpayment of federal income taxes.

## Count VI
## Negligence Per Se

153.   Plaintiff hereby repeats, realleges, and incorporates each and every allegation contained in the above paragraphs of the Complaint as though fully set forth herein.

154.   Defendant owed Plaintiff and the members of the Class a duty to act as a reasonably prudent broker when providing tax information reporting relating to its clients' accounts, including by promptly and fully correcting any prior erroneous tax information reporting upon learning of the error.

155.   Defendant has breached its duty to Plaintiff and members of the Class in that Defendant violated applicable Treasury Regulations when providing tax information reporting relating to its clients' accounts and failed to promptly and

fully correct its prior erroneous tax information reporting upon learning of the error.

156.   Plaintiff and the members of the Class are intended beneficiaries of the applicable Treasury Regulations regarding tax information reporting, because these regulations are intended to ensure that brokers provide their clients with accurate tax information to enable the clients to accurately report their taxes.

157.   The injuries suffered by Plaintiff and the members of the Class are the type of injuries that the applicable Treasury Regulations are designed to protect against, because they were injured when, *inter alia*, they filed their taxes inaccurately because of the incorrect information supplied to them by Defendant.

158.   As a result of Defendant's negligence, Plaintiff and the members of the Class have sustained substantial damages, including but not limited to overpayment of federal income taxes.

**Count VII**
**Punitive Damages**

159.   Plaintiff hereby repeats, realleges, and incorporates each and every allegation contained in the above paragraphs of the Complaint as though fully set forth herein.

160.   In or about 2016 Defendant's employee Brian Edgar began to notify Defendant that its tax information reporting to clients for taxable municipal bonds was incorrect and harmful. After receiving this information, Defendant purposely

continued its incorrect and harmful practices, and failed to promptly and fully correct its prior erroneous tax information reporting upon learning of the error.

161.   Defendant wantonly and willfully disregarded that Plaintiff and the members of the Class would foreseeably be harmed by its inaccurate tax information reporting and its failure to promptly and fully correct its prior erroneous tax information reporting. Defendant acted with knowledge that its conduct created a high probability of harm to Plaintiff and the members of the Class, and Defendant was recklessly indifferent to this harm.

162.   Defendant has committed actionable torts of negligence and breach of fiduciary duties, and Defendant's tortious conduct was of an egregious nature. This conduct was directed to Plaintiff and members of the Class, and was part of a pattern of conduct directed at the public generally.

163.   Plaintiff and the members of the Class are entitled to punitive damages, in order to punish and deter Defendant's wrongful conduct.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action on behalf of the Class and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as class counsel;

(b)     awarding damages in favor of Plaintiff and the other Class members against Defendant, together with interest thereon;

(c)     awarding punitive damages in favor of Plaintiff and the other Class members against Defendant;

(d)     awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e)     awarding Plaintiff and the Class such other and further relief as the Court may deem just and proper.

## X.     JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: October 5, 2021         GLANCY PRONGAY & MURRAY LLP

By: */s/ Lee Albert*
Lee Albert (State Bar No. 26231986)
  *lalbert@glancylaw.com*
230 Park Ave, Suite 358
New York, New York 10169
(212) 682-5340

Garth Spencer (*pro hac vice to be filed*)
  *gspencer@glancylaw.com*
1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 201-9150

GOODMAN HURWITZ & JAMES, P.C.
William H. Goodman
  (*pro hac vice to be filed*)
  *bgoodman@goodmanhurwitz.com*
1394 E Jefferson Ave
Detroit, MI 48207
(313) 567-6170

*Attorneys for Plaintiff Richard Goodman*
  *and the Proposed Class*

44

## <u>Certification Pursuant to Local Civil Rule 201.1(d)(3)</u>

I certify that the above-captioned matter is not arbitrable because the amount in controversy exceeds the sum of $150,000 exclusive of interest and costs and any claim for punitive damages. I certify under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of October, 2021.

*/s/ Lee Albert*
Lee Albert

## <u>Certification Pursuant to Local Civil Rule 11.2</u>

I certify that to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding. I certify under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of October, 2021.

*/s/ Lee Albert*
Lee Albert
