Lee Albert (State Bar No. 26231986)
*lalbert@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
230 Park Ave, Suite 358
New York, New York 10169
(212) 682-5340

Garth A. Spencer (admitted *pro hac vice*)
*gspencer@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 201-9150

[Additional Counsel on Signature Page]

*Attorneys for Plaintiff Richard Goodman
and the Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RICHARD GOODMAN, Individually And As Trustee of the Richard M. Goodman Revocable Living Trust, And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br>vs.<br><br>UBS FINANCIAL SERVICES INC.,<br><br>Defendant. | Case No.: 2:21-cv-18123-KM-MAH<br><br>**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT**<br><br>**Motion Day:** February 22, 2022<br><br>Honorable Kevin McNulty |

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................ 1

FACTUAL BACKGROUND .............................................................. 2

     A.    Background Regarding Defendant UBS.................................... 2

     B.    Background Regarding Taxable Municipal Bonds ................... 2

     C.    Treasury Department Regulations Require Reporting Of Amortizable Bond Premium For Taxable Municipal Bonds ...................................................................................... 3

     D.    Defendant Failed To Report Amortizable Bond Premium For Taxable Municipal Bonds, Harming Its Clients................. 3

ARGUMENT ...................................................................................... 5

   I.    Applicable Legal Standards Disfavor UBS's Motion.......................... 5

   II.    UBS Breached Its Express Contracts With Its Clients ....................... 6

     A.    In The CRA, UBS Made Forms 1099 And Guides To Form 1099 Part Of Its Contract With Clients........................... 7

     B.    UBS's Agreements And Disclosures Booklet Further Supports Plaintiff's Claims...................................................... 11

     C.    UBS Breached The Express Terms Of Its Forms 1099 and Guides To Form 1099, Damaging Its Clients.................. 13

     D.    UBS Fails To Exclude Forms 1099 And Guides To Form 1099 From The Scope Of Its Contracts .................................. 14

     E.    UBS Mischaracterizes The "Disclaimers" In The CRA, Which Do Not Support Its Argument...................................... 16

   III.    UBS Breached The Implied Covenant Of Good Faith And Fair Dealing ............................................................................... 19

     A.    Plaintiff's Implied Covenant Claim Involves Conduct Distinct From The Express Contract Claim ........................... 22

i

     B.    Plaintiff's Claims For Breach Of The Implied Covenant And Express Terms Should Be Considered In The Alternative ................................................................ 23

IV.   The Economic Loss Rule Does Not Bar Plaintiff's Tort Claims ....... 24

     A.    UBS Owes Its Clients Extra-Contractual Duties, To Which The Economic Loss Rule Does Not Apply ................. 25

     B.    The Economic Loss Rule Does Not Bar Plaintiff's Tort Claims Because This Is Not A Product Liability Action ........ 27

     C.    New York's Exception For Negligent Misrepresentation Claims Applies Here ................................................................ 29

     D.    Plaintiff's Tort Claims Should Be Considered In The Alternative To His Contract Claims ......................................... 30

V.    UBS Owed Plaintiff, The Class, and Its Other Clients Fiduciary Duties With Respect To Tax Information Reporting ......................... 31

     A.    This Case Is About Tax Information Reporting, Not Investment Decisions ................................................................ 31

     B.    The Complaint States A Claim For Breach Of Fiduciary Duties ........................................................................................... 33

VI.   UBS Owed Its Clients A Duty Of Reasonable Care With Respect To Tax Information Reporting ............................................. 35

     A.    The Complaint States A Claim For Negligence ..................... 35

     B.    The Complaint States A Claim For Negligent Misrepresentation ..................................................................... 38

VII.  UBS Is Liable For Punitive Damages ................................................ 39

VIII. The Court Should Grant Leave To Amend, If Necessary ................. 40

CONCLUSION ...................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*151 W. Assocs. v. Printsiples Fabric Corp.*,
  61 N.Y.2d 732 (N.Y. 1984) ................................................................ 7

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*,
  96 N.Y.2d 280 (N.Y. 2001) ........................................................ 27, 28

*Adams v. Gould Inc.*,
  739 F.2d 858 (3d Cir. 1984) ............................................................ 40

*Adler v. Pataki*,
  185 F.3d 35 (2d Cir. 1999) ........................................................ 24, 30

*Am. Exp. Bank Ltd. v. Uniroyal, Inc.*,
  164 A.D.2d 275 (N.Y. App Div. 1990) .............................................. 7

*Anwar v. Fairfield Greenwich Ltd.*,
  728 F. Supp. 2d 372 (S.D.N.Y. 2010) ........................................ 30, 39

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................... 6

*Banco Multiple Santa Cruz, S.A. v. Moreno*,
  888 F. Supp. 2d 356 (E.D.N.Y. 2012) ............................. 21, 25, 28, 31

*Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*,
  692 F.3d 42 (2d Cir. 2012) .............................................................. 25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .......................................................................... 5

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
  778 F. Supp. 2d 375 (S.D.N.Y. 2011) ......................................... 11, 12

*Buchanan v. Dowdy*,
  772 F. Supp. 968 (S.D. Tex. 1991) .................................................. 37

*Bullock v. Borough of Roselle*,
   2018 WL 4179481 (D.N.J. Aug. 31, 2018) ........................................................ 39

*China Falcon Flying Ltd. v. Dassault Falcon Jet Corp.*,
   2016 WL 1394437 (D.N.J. Apr. 8, 2016) .......................................................... 23

*Clemens v. USV Pharm.*,
   838 F.2d 1389 (5th Cir. 1988) ............................................................................. 37

*Conway v. Icahn & Co.*,
   16 F.3d 504 (2d Cir. 1994) .................................................................................. 32

*Courtien Commc'ns, Ltd. v. Aetna Life Ins. Co.*,
   193 F. Supp. 2d 563 (E.D.N.Y. 2002) ................................................................ 23

*Dalton v. Educ. Testing Serv.*,
   87 N.Y.2d 384 (N.Y. 1995) .......................................................................... 19, 22

*Di Benedetto v. Pan Am World Serv., Inc.*,
   359 F.3d 627 (2d Cir. 2004) ................................................................................ 35

*Durr Mech. Constr., Inc. v. PSEG Fossil, LLC*,
   516 F. Supp. 3d 407 (D.N.J. 2021) ..................................................................... 22

*Emerald Town Car of Pearl River, LLC v. Philadelphia Indem. Ins. Co.*,
   2017 WL 1383773 (S.D.N.Y. Apr. 12, 2017) .............................................. 28, 29

*Fantozzi v. Axsys Techs., Inc.*,
   2008 WL 4866054 (S.D.N.Y. Nov. 6, 2008) ...................................................... 24

*Foman v. Davis*,
   371 U.S. 178 (1962) ............................................................................................ 40

*Getty Ref. & Mktg. v. Linden Maint. Corp.*,
   168 A.D.2d 480 (N.Y. App. Div. 1990) .............................................................. 15

*Givati v. Air Techniques, Inc.*,
   104 A.D.3d 644 (N.Y. App. Div. 2013) ................................................................ 7

*Hedges v. United States*,
404 F.3d 744 (3d Cir. 2005) ............................................................... 5

*Howmedica Osteonics Corp. v. NuVasive, Inc.*,
2018 WL 6011936 (D.N.J. Nov. 15, 2018) ........................................ 31

*Hydro Invs., Inc. v. Trafalgar Power Inc.*,
227 F.3d 8 (2d Cir. 2000) ....................................................... 27, 28, 38

*Kimmell v. Schaefer*,
89 N.Y.2d 257 (N.Y. 1996) ........................................................ 38, 39

*Landon v. Kroll Lab'y Specialists, Inc.*,
91 A.D.3d 79 (N.Y. App. Div. 2011) ................................................. 25

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
514 U.S. 52 (1995) ............................................................................. 7

*Nat'l Union Fire Ins. Co. of Pittsburg v. Beelman Truck Co.*,
203 F. Supp. 3d 312 (S.D.N.Y. 2016) ............................................ 9, 10

*Palka v. Servicemaster Mgmt. Servs. Corp.*,
83 N.Y.2d 579 (N.Y. 1994) ......................................................... 35, 36

*Palsgraf v. Long Island R. Co.*,
248 N.Y. 339 (N.Y. 1928) ................................................................ 36

*Parrott v. Coopers & Lybrand, L.L.P.*,
95 N.Y.2d 479 (N.Y. 2000) .............................................................. 29

*Phillips v. Cty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008) .......................................................... 5, 24

*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*,
420 F. Supp. 3d 123 (S.D.N.Y. 2019) ............................................... 29

*Prakhin v. Fulton Towers Realty Corp.*,
122 A.D.3d 601 (N.Y. App. Div. 2014) ........................................ 19, 23

*Raley v. Bank of Am., N.A.*,
  2014 WL 6684906 (N.D. Ala. Nov. 25, 2014) ..................................................... 37

*Salomon Bros., Inc. v. Huitong Int'l Tr. & Inv. Corp.*,
  1996 WL 675795 (S.D.N.Y. Nov. 21, 1996) ....................................................... 32

*Security Plans, Inc. v. CUNA Mut. Ins. Soc.*,
  769 F.3d 807 (2d Cir. 2014) .................................................................... 21, 22

*Smith v. Bank of America, N.A.*,
  2018 WL 6071048 (C.D. Cal. July 2, 2018) ....................................................... 37

*St. John's Univ., New York v. Bolton*,
  757 F. Supp. 2d 144 (E.D.N.Y. 2010) ................................................. 23, 24, 33, 34

*Starr Indem. & Liab. Co. v. Brightstar Corp.*,
  388 F. Supp. 3d 304 (S.D.N.Y. 2019) ............................................................... 9

*Tobia v. United Grp. of Companies, Inc.*,
  2016 WL 5417824 (N.D.N.Y. Sept. 22, 2016) ............................................... 30, 33

*United States v. Szur*,
  289 F.3d 200 (2d Cir. 2002) ....................................................................... 32

*United States v. Wolfson*,
  642 F.3d 293 (2d Cir. 2011) ....................................................................... 32

*White v. Guarente*,
  43 N.Y.2d 356 (N.Y. 1977) ......................................................................... 30

## STATUTES

26 U.S.C. § 171 ...................................................................................... 3

26 U.S.C. § 6049 ................................................................... 3, 12, 17, 26

## RULES

Fed. R. Civ. P. 8 ......................................................................... *passim*

## **<u>REGULATIONS</u>**

26 C.F.R. § 1.6049-9(b).............................................................................. 3, 26

Plaintiff Richard Goodman respectfully submits this memorandum of law in opposition to Defendant's Motion to Dismiss the Class Action Complaint.[1]

## **INTRODUCTION**

This case is simple. Defendant UBS Financial Services Inc. ("UBS") botched a basic tax information reporting requirement that is a fundamental part of any broker-client relationship. In so doing, UBS provided inaccurate tax information to its clients, including Plaintiff and the Class, causing them to incur tens of millions of dollars in aggregate tax overpayments and related expenses. UBS's own employee repeatedly informed UBS of this inaccurate tax reporting, and repeatedly asked UBS to fix the problem, yet UBS failed to do so. UBS implicitly admitted its mistaken reporting when it issued a series of purportedly "corrected" tax information returns to Plaintiff, belatedly acknowledging that it had overstated his taxable income by over $100,000. In its motion, UBS does not genuinely dispute any of this.

The law is simple. UBS is liable for its botched tax reporting under a straightforward application of contract and tort principles. UBS argues that its clients have no legal remedy, hiding behind a smattering of formalistic arguments while failing to address the heart of Plaintiff's claims. UBS's motion fails to engage with

---

[1] Dkt No. 13 and 13-1. Unless otherwise indicated, all emphasis in this brief has been added, all internal citations, quotation marks, and alterations have been removed, and citations in the form of "¶__" refer to the Class Action Complaint (Dkt No. 1) ("Complaint").

the text of its contracts with clients, or the true nature of its relationship with clients. UBS can and should be held accountable for its misconduct, and for its reckless indifference to the substantial harm resulting to its clients.

## FACTUAL BACKGROUND

### A.   Background Regarding Defendant UBS

Defendant is a part of the UBS Group, one of the world's largest financial institutions. ¶12. Defendant primarily operates as a wealth management firm serving U.S. clients. ¶13. Defendant operates throughout the United States, and has over 1 million clients and more than $500 billion in assets under management. ¶¶14-16. Defendant maintains financial accounts for its clients through which they can purchase and hold investment securities, including municipal bonds.

### B.   Background Regarding Taxable Municipal Bonds

Bonds issued by state or local governments are referred to as municipal bonds, or "munis." ¶21. Interest on many municipal bonds is exempt from federal income taxation. *Id.* However, interest on municipal bonds is subject to federal income taxation in certain instances where the bond proceeds substantially benefit private interests; such bonds are called taxable municipal bonds. ¶22. A large secondary market exists for the post-issuance trading of municipal bonds, in which bonds may be bought at a premium or a discount to their stated principal value. ¶¶23-25, 29. UBS's clients own tens of billions of dollars of municipal bonds in their UBS accounts, of which billions of dollars are taxable municipal bonds. ¶¶16-18; 26-28.

### C. Treasury Department Regulations Require Reporting Of Amortizable Bond Premium For Taxable Municipal Bonds

Internal Revenue Code ("IRC," Title 26 of the U.S. Code) Section 6049 requires financial institutions that collect interest payments and transmit them to clients to file information returns with the IRS, and to provide written statements to their clients reflecting the information reported to the IRS, so that the clients can accurately prepare their own income tax returns each year. ¶¶32-33.

Applicable Treasury Regulations including 26 C.F.R. § 1.6049-9(b), and the IRS's Instructions for Form 1099-INT, require financial institutions to report to their clients amortizable bond premium for taxable bonds (including taxable municipal bonds) acquired on or after January 1, 2014. ¶¶37-42.[2] Amortizable bond premium is essentially the total amount of a bond's premium, allocated over the remaining life of the bond until its maturity. ¶30. Pursuant to IRC Section 171 an owner of bonds acquired at a premium may use amortizable bond premium as a deduction or an offset to interest income, in order to reduce the owner's taxable income. *Id*.

### D. Defendant Failed To Report Amortizable Bond Premium For Taxable Municipal Bonds, Harming Its Clients

UBS failed to report amortizable bond premium for taxable municipal bonds

---

[2] Although UBS's tax information reporting violated the applicable Treasury Regulations, to be clear, Plaintiff does not bring this action in an attempt to enforce those regulations. Rather, Plaintiff brings contract claims based on UBS's promises made to clients regarding tax information reporting, and tort claims based on UBS's breach of duties owed to clients with respect to tax information reporting.

in Forms 1099 sent to its clients and the IRS. ¶86. Instead, UBS reported only the gross amount of interest attributable to taxable municipal bonds, without reducing this by appropriate amounts of amortizable bond premium, and without separately stating the appropriate amounts of amortizable bond premium. *Id.* Defendant does not deny these facts. As a direct result, UBS substantially overstated the amounts of taxable income attributable to its clients from their taxable municipal bonds. *Id.*

UBS issued Plaintiff Forms 1099 for the 2015-2018 tax years that failed to report amortizable bond premium for taxable municipal bonds. ¶¶95-98. Again, Defendant does not deny this fact. UBS later issued Plaintiff a series of purportedly "corrected" 1099s that reported amortizable bond premium for those bonds, reducing Plaintiff's reported taxable income by over $100,000 in the aggregate. ¶¶100-04. Brian Edgar, a financial advisor working for Defendant, observed that UBS failed to correctly report amortizable bond premium for multiple taxable municipal bonds owned by multiple clients with whom he worked, and upon further investigation he observed that UBS failed to correctly report amortizable bond premium for all taxable municipal bonds for all clients that he checked. ¶¶89-90.

Beginning in or about 2016 and continuing over multiple years Mr. Edgar notified numerous UBS employees of this problem to attempt to have it corrected. ¶91. While Mr. Edgar eventually prevailed on UBS to issue amended Forms 1099 to certain clients, when he inquired whether the incorrect reporting would be fixed

4

on a firm-wide basis he was informed that UBS did not plan to do so, but to only to deal with the issue for specific client accounts if a client happened to raise it. ¶93.

UBS's failure to report amortizable bond premium harmed Plaintiff and the Class of UBS clients by, *inter alia*, causing them to overstate their taxable income when filing their taxes, and to make resulting tax overpayments. ¶¶106-12. Plaintiff has alleged that UBS harmed him and its other clients in the aggregate by at least tens of millions of dollars. ¶6.

## ARGUMENT

### I.    Applicable Legal Standards Disfavor UBS's Motion

The legal standards applicable on this Rule 12(b)(6) motion to dismiss strongly favor Plaintiff, and disfavor Defendant's motion. As the moving party, "[t]he defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). The Court must "accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable" to the plaintiff. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The complaint need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The factual allegations need only raise the right to relief above a speculative level, so that a claim is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That standard is met "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II.    UBS Breached Its Express Contracts With Its Clients

As alleged in the Complaint, and as UBS admits, the Client Relationship Agreement ("CRA") is a contract between Defendant and its clients. ¶51. It is a standardized form contract that is uniform across all of Defendant's clients, and it is a contract of adhesion drafted exclusively by UBS. ¶¶45-46. UBS's primary argument is that the terms of the contractual relationship between it and its clients are defined exclusively by the CRA (Exhibit A to the motion (Dkt No. 13-2)) and an Agreements and Disclosures booklet (Exhibit B to the motion (Dkt No. 13-3)). But this argument ignores the express contractual language that UBS itself drafted.

UBS notably fails to analyze the key contractual terms discussed in the Complaint. When that contractual language is analyzed, it is clear that the terms of Form 1099s UBS sent to Plaintiff, the Class, and its other clients, and guides to Form 1099 UBS made available to all concerned, constitute valid and binding terms of the contractual relationship. UBS does not even bother to dispute that if these documents form part of its contract with clients, then it has breached their express terms, which promised that UBS would report amortizable bond premium to clients. *See* ¶¶60-75.

Under the New York law applicable here pursuant to UBS's choice of law provision (*see* ¶58; CRA at 13), "[a] court's fundamental objective in interpreting a

contract is to determine the parties' intent from the language employed and to fulfill their reasonable expectations." *Givati v. Air Techniques, Inc.*, 104 A.D.3d 644, 645 (N.Y. App. Div. 2013). "[A] court should not read a contract so as to render any term, phrase, or provision meaningless or superfluous." *Id.* "Words and phrases are given their plain meaning." *Am. Exp. Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 277 (N.Y. App Div. 1990). The plain meaning of the words in UBS's contracts strongly favors Plaintiff's interpretation, and precludes UBS's interpretation.

However, should the Court determine that the relevant provisions are capable of multiple interpretations, such ambiguity is to be construed in favor of Plaintiff and against UBS. This is so not only because at this stage all reasonable inferences must be drawn in Plaintiff's favor, but also because UBS was the sole drafter of its contracts of adhesion. "It has long been the rule that ambiguities in a contractual instrument will be resolved *contra proferentem*, against the party who prepared or presented it." *151 W. Assocs. v. Printsiples Fabric Corp.*, 61 N.Y.2d 732, 734 (N.Y. 1984); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) ("The reason for this rule is to protect the party who did not choose the language from an unintended or unfair result").

## A. In The CRA, UBS Made Forms 1099 And Guides To Form 1099 Part Of Its Contract With Clients

As alleged in the Complaint, and confirmed by the CRA as reproduced in Defendant's Exhibit A, the CRA defines the contractual relationship between UBS

7

and its clients in extremely broad terms. Under the CRA's express language, UBS's Forms 1099 and guides to Form 1099 form part of that contractual relationship. Those documents are incorporated by reference into the CRA, and also constitute later arising contractual modifications pursuant to the CRA's terms specifying how the agreements between UBS and its clients are to be amended.

The CRA contains several terms relevant to determining which documents form part of the contract between UBS and its clients. *First*, the CRA states:

> Known as the Client Relationship Agreement, this document outlines the terms and conditions of your relationship with us. By maintaining your Accounts at UBS, you agree to these terms and conditions *and the other agreements and disclosures we refer to here*.

¶50; CRA at 1 (emphasis added). This provision expressly incorporates into the contract all other disclosures referred to in the CRA. The term "disclosures" is not defined anywhere in the CRA, and so carries its customary, broad meaning. The CRA refers to Forms 1099 and other tax documents, discussing delivery of "[t]ax reporting documents, including 1099s and other tax documents that are available now or become available in the future." ¶56; CRA at 14. Tax information returns on Form 1099 and UBS's guides to Form 1099 disclose important tax information to UBS's clients and therefore constitute "disclosures" within the plain meaning of that word. Therefore, these documents form part of UBS's contract with its clients.

This provision is more than sufficient to incorporate by reference UBS's Forms 1099 and guides to Form 1099 under New York law. "To incorporate a

document by reference, [n]o particular mode of reference is necessary for that purpose; any language which indicates the intent that the two shall make one instrument . . . is sufficient." *Starr Indem. & Liab. Co. v. Brightstar Corp.*, 388 F. Supp. 3d 304, 341 (S.D.N.Y. 2019), *aff'd*, 828 F. App'x 84 (2d Cir. 2020). "[A] document is incorporated by reference into a contract if (1) it is clearly identified in the agreement, and (2) the contract contains language that clearly communicates that the purpose of the reference is to incorporate the referenced material into the contract." *Nat'l Union Fire Ins. Co. of Pittsburg v. Beelman Truck Co.*, 203 F. Supp. 3d 312, 322 (S.D.N.Y. 2016) (cleaned up). UBS's Forms 1099 and guides to Form 1099 are clearly identified in the CRA because they constitute "disclosures" referred to in the CRA, which even expressly refers to "1099s." The CRA clearly communicates its intent to incorporate all such disclosures by stating that the client agrees to them by maintaining a UBS account.

> *Second*, and similarly, the CRA states:

> We refer to the Client Relationship Agreement together with *all other agreements and disclosures that we make available to you*, and any amendments, as our "Agreement" with you for your Accounts.

¶52; CRA at 1 (emphasis added). This provision incorporates into the contract all disclosures that UBS makes available to the client. Each year UBS makes available to its clients a Form 1099 and a guide to Form 1099. ¶¶60, 67. Again, the term "disclosures" is not defined and tax information returns on Form 1099 and UBS's

guides to Form 1099 constitute disclosures within the plain meaning of that word, making these documents part of UBS's contracts with its clients. This provision clearly identifies all disclosures that UBS makes available to the client, and demonstrates an intent to incorporate them by stating that they constitute part of the "Agreement" between UBS and the client. *See Nat'l Union*, 203 F. Supp. 3d at 322.

> *Third*, the CRA states:

> This Client Relationship Agreement *and the related documents*, *including* the General Terms and Conditions and the rest of the Agreements and Disclosures booklet form the entire "Agreement" between you and UBS Financial Services Inc. or UBS Financial Services Incorporated of Puerto Rico with respect to your Account(s).

¶54; CRA at 13 (emphasis added). This provision incorporates into the contract all documents "related" to the CRA. What constitutes a document "related" to the CRA is not defined. Form 1099s and UBS's guide to Form 1099 are related to the CRA because, *inter alia*, (i) the CRA expressly refers to "[t]ax reporting documents, including 1099s and other tax documents," and (ii) Forms 1099 are a customary, and even statutorily required, part of the relationship between any broker and its client. Once again, this provision clearly identifies all documents related to the CRA, and demonstrates an intent to incorporate them by stating that they constitute part of the "Agreement" between UBS and the client.

> *Fourth*, the same CRA provision continues:

> The accounts and services we offer may change over time. *We may change our Agreement with you at any time by sending you a written*

10

*notice of the change*, and the changes will be effective on the date of the notice unless we specify a later date. We also may cease to offer services at any time without prior notice. Your continued use of your Accounts and our products and services constitutes your acceptance of the new terms and conditions. All changes by you to the Agreement will become effective only if offered in writing and signed by us.

¶54; CRA at 13 (emphasis added). Thus, UBS claims the right to modify its contracts with clients simply by "sending you a notice of the change." The term "notice" is not defined. Form 1099s and UBS's guide to Form 1099 notify UBS's clients of important tax information, and so constitute "notices" which modify and form part of UBS's contract with its clients. Where a contract specifies how it may be amended, such provisions are respected and given full effect. *See BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 411 (S.D.N.Y. 2011).

As demonstrated above, multiple express terms show that UBS's Forms 1099 and guides to Form 1099 constitute part of its contract with clients. These documents are incorporated by reference, and are also valid contractual modifications.

## B.   UBS's Agreements And Disclosures Booklet Further Supports Plaintiff's Claims

UBS filed with its motion the Agreements and Disclosures booklet (Dkt No. 13-3), and correctly argues that this is part of UBS's contract with clients. The booklet in fact supports Plaintiff's arguments, and dooms UBS's attempts to evade any responsibility to its clients for its botched tax information reporting.

The Agreements and Disclosures booklet contradicts UBS's claim that its

duties to brokerage clients were strictly limited to executing securities transactions as instructed, and that UBS assumed no other obligations to them. Under the heading "Our Services as a Broker-Dealer and Relationship With You," the booklet states "As a full-service broker-dealer, our services are not limited to taking customer orders and executing securities transactions." Agreements and Disclosures at 3. Under the heading "Our Responsibilities to You as a Broker-Dealer," UBS states "As your broker-dealer, we have a duty to deal fairly with you." *Id.*

Among the services promised and duties undertaken by UBS in the booklet is an implicit statement that UBS will provide tax forms to the client, **upon which UBS instructs the client to rely**. In the booklet's "General Terms and Conditions," UBS specifically warns clients not to rely on tax cost basis information provided in *account statements* when preparing their tax returns, because this information is not final and "may be adjusted." *Id.* at 12. Yet, in stark contrast, UBS then states "Please rely only on your *year-end tax forms* and order confirmations when you prepare your tax return." *Id.* (emphasis added). This confirms the parties' clear understanding that UBS would provide year-end tax forms to its clients, the accuracy of which they were expected, and entitled, to rely upon when preparing their own annual tax returns. Form 1099 is a year-end tax form in the plain meaning of that phrase, as a broker is required to furnish clients a Form 1099 following the end of each tax year so that the client can accurately prepare his tax return. *See* ¶33; IRC Section 6049.

Finally, lending further support to Plaintiff's allegation that UBS's Forms 1099 and guides to Form 1099 are part of the contract between UBS and its clients, the Agreements and Disclosures booklet states, "[d]uring the account opening process and *throughout your relationship with UBS*, you will be presented with important *disclosures and documents* that govern your relationship with us." Agreements and Disclosures at 5 (emphasis added). This mirrors the CRA's broad language stating that any document, notice, agreement, or disclosure sent by UBS to its clients becomes part of their contractual relationship, and further supports the common sense interpretation of those broad terms according to their plain meaning, under which Forms 1099 and guides to Form 1099 are part of the contractual relationship between UBS and its clients.

## C. UBS Breached The Express Terms Of Its Forms 1099 and Guides To Form 1099, Damaging Its Clients

UBS does not dispute that if its Forms 1099 and its guides to Form 1099 are part of its contracts with clients then it is in breach. This is likely because such an argument would be futile—UBS's Forms 1099 and its guides to Form 1099 expressly promise to report amortizable bond premium to clients, which it failed to do. For example, UBS's 2017 guide to Form 1099 stated:

> For a covered security acquired at premium, unless you notified UBS in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to amortize the premium under section 171, *we will report a gross amount for both the interest paid to you and the premium amortization for the year*.

¶63 (emphasis added); *see also* ¶64.

UBS's Form 1099s similarly promised that UBS would report amortizable bond premium. ¶¶72-73. For example, UBS's 2017 consolidated Form 1099 stated:

> For a taxable covered security . . . *shows the amount of premium amortization allocable to the interest payment(s)*, unless you notified the payer in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to amortize bond premium . . . .

¶73 (emphasis added). UBS breached these promises by failing to report amortizable bond premium for taxable municipal bonds. ¶¶86-104.

Nor does UBS genuinely dispute that its failure to report amortizable bond premium harmed clients. UBS's breach harmed clients by, *inter alia*, causing them to overstate their taxable income when filing their taxes, and to make resulting tax overpayments. ¶¶106-112. Plaintiff has alleged UBS harmed him and the Class of UBS clients in the aggregate by at least tens of millions of dollars. ¶6.

### D.  UBS Fails To Exclude Forms 1099 And Guides To Form 1099 From The Scope Of Its Contracts

UBS makes two main arguments, neither of which has merit, to try to avoid the conclusion that its Forms 1099 and guides to Form 1099 are part of its contracts with clients: that those documents are not incorporated by reference, and that the CRA contains an integration clause. Both arguments ignore the plain text of the contract terms drafted by UBS and imposed on its clients stating that any document, notice, agreement, or disclosure sent by UBS to its clients becomes part of their

14

contractual relationship. *See supra* Parts II.A-B.

The purported integration clause states "This Client Relationship Agreement *and the related documents*, *including* the General Terms and Conditions and the rest of the Agreements and Disclosures booklet form the entire 'Agreement'." ¶54; CRA at 13 (emphasis added). This defines the contract to include the CRA and any "related documents," "including" but not limited to the Agreements and Disclosures booklet. The open-ended phrasing UBS chose here cannot support its current contention that the contract is limited exclusively to the CRA and the Agreements and Disclosures booklet. To the contrary, as explained *supra*, UBS's contractual relationship with its clients includes "the other agreements and disclosures" referred to in the CRA, "all other agreements and disclosures" that UBS makes available to clients, documents "related" to the CRA, any "written notice" UBS sends to clients, and "disclosures and documents" that UBS sends to clients throughout their relationship. CRA at 1, 13; Agreements and Disclosures at 5.

UBS's arguments also fail because, even if credited, they are irrelevant to the question of whether UBS's Forms 1099 and the guides to Form 1099 constituted contractual *modifications* or *amendments*, supplying additional terms when UBS later sent those documents to clients. *See Getty Ref. & Mktg. v. Linden Maint. Corp.*, 168 A.D.2d 480, 481 (N.Y. App. Div. 1990) ("Neither the parol evidence rule nor the merger clause of the underlying contract prohibits proof of a subsequent

additional agreement or of a subsequent modification of the original agreement").[3]

UBS intentionally decided to draft its adhesion contracts in exceptionally broad terms so as to incorporate any agreement, disclosure, notice, or document that UBS made available to its clients, either at the time of account opening or at any later time. UBS cannot now selectively pick and choose which of those documents are currently to its advantage to consider as part of its contracts.

### E. UBS Mischaracterizes The "Disclaimers" In The CRA, Which Do Not Support Its Argument

UBS points to two provisions in the CRA that it claims absolve it of any possible contractual duties with respect to tax information reporting. UBS mischaracterizes these provisions, neither of which support its argument.

*First*, UBS's contract of adhesion required clients to "represent" that "[y]ou understand that UBS provides financial and investment services only and does not provide legal or tax *advice*." CRA at 2 (emphasis added). Of course, this provision says absolutely nothing about tax *information reporting*, which is distinct from "legal or tax advice." Legal or tax advice is the type of analysis that a lawyer or accountant would give when performing an expert interpretation of complex tax

---

[3] As explained above, the CRA states "We may change our Agreement with you at any time by sending you a written notice of the change." ¶54; CRA at 13. Therefore, at the very least, the terms of the Forms 1099 and guides to Form 1099 became part of UBS's contractual relationship with clients when UBS sent those documents to clients, regardless of whether such documents were incorporated into the contracts at the time of account opening.

laws. UBS does not provide such services to clients. On the other hand, the mechanical and statutorily required act of a broker's tax information reporting to clients consists of simple record keeping and arithmetic not encompassed by the phrase "legal or tax *advice*." UBS *does* provide tax information reporting to clients.

Moreover, UBS and its clients necessarily understood that UBS would provide annual Forms 1099 to its clients as required by law and as contemplated by the CRA. *See* CRA at 14 (discussing delivery of "Tax reporting documents, including 1099s and other tax documents"); IRC Section 6049. Adopting UBS's proposed interpretation would produce the absurd and counterfactual result that the CRA would state that UBS does not provide tax information reporting.

To the extent UBS argues that this provision implicitly warned clients not to rely on the *accuracy* of UBS's tax information reporting, that tenuous interpretation does not follow from the provision's plain text. Furthermore, it is contradicted by the express, UBS-drafted language contained elsewhere in UBS's contracts. *See* Agreements and Disclosures at 12 ("**Please rely only on your year-end tax forms and order confirmations when you prepare your tax return**.") (emphasis added).

*Second*, UBS's contract of adhesion required clients to "represent" that "all reporting and tax associated obligations have been and will continue to be fulfilled with respect to any assets deposited in your Account." CRA at 2. However, this provision by its terms relates only to "assets deposited" into the account by the client,

not to securities purchased in the account by UBS with the deposited funds. As such it merely appears to be aimed at protecting UBS from anti-money laundering laws with respect to the provenance of customer deposits. This provision does not relate to UBS's own statutory obligations to provide tax information reporting to clients with respect to securities purchased and held by UBS for the customer's account.

Indeed, it would be absurd to adopt UBS's construction of this provision whereby the *client* represents that *UBS* will continue to fulfill *UBS's* statutory obligation to provide tax information reporting to the client. Once again, UBS's tortured interpretation does not follow from the provision's plain text, and it is contradicted by the express language of UBS's contracts instructing clients to rely on year-end tax forms provided by UBS. *See* Agreements and Disclosures at 12.

Simply put, UBS's "disclaimers" do not say what UBS contends they do. UBS strains these provisions in an attempt to escape its contractual obligations. If UBS had chosen to state in the CRA that it undertook no responsibility to provide Forms 1099 that accurately reported amortizable bond premium or other tax information, then, as the sole drafter of its adhesion contracts, it could have done so. UBS did not adopt any such provision. Instead, UBS encouraged clients to rely on its year-end tax forms, and promised clients that it would report amortizable bond premium. The purportedly exculpatory language that UBS now points to fails to absolve it of responsibility for its clear breaches of contract.

18

### III.   UBS Breached The Implied Covenant Of Good Faith And Fair Dealing

Under New York law every contract contains an implied covenant of good faith and fair dealing, which requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (N.Y. 1995). The covenant encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id.* In matters subject to the promisor's exercise of discretion, the covenant "includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id.* The covenant "is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Prakhin v. Fulton Towers Realty Corp.*, 122 A.D.3d 601, 602 (N.Y. App. Div. 2014).

Based on the terms of the CRA and the Agreements and Disclosures booklet, a reasonable brokerage client would be justified in understanding that UBS promised to make reasonable efforts to report accurate tax information to them, and to promptly investigate and remedy suspected errors in its tax information reporting. *See* CRA at 14 (discussing delivery of "[t]ax reporting documents, including 1099s"); Agreements and Disclosures at 3 ("we have a duty to deal fairly with you"); *id.* at 12 ("***Please rely only on your year-end tax forms*** **and order confirmations**

19

**when you prepare your tax return.**") (emphasis added). But UBS failed to take reasonable steps to correct known, systemic deficiencies in its tax information reporting for municipal bonds. ¶¶76-85. And UBS simply ignored repeated attempts by its own employee to have UBS correct its failure to report amortizable bond premium for taxable municipal bonds. ¶¶89-93. UBS thus breached the implied covenant of good faith and fair dealing, and harmed its clients.

UBS has admitted that "[f]rom July 2009 through December 2013 . . . UBS failed to reasonably supervise and to have an adequate supervisory system," which caused UBS to misreport municipal bond tax information to clients. ¶79.[4] UBS also admitted that due to systematic miscoding for municipal bond interest, "UBS sent inaccurate Forms 1099 to customers . . . for calendar years 2009 through 2012." ¶80. UBS later admitted that this misconduct continued beyond 2013, even after being fined and censured by FINRA for it in 2015, again causing UBS to send clients inaccurate Forms 1099 misreporting municipal bond tax information. ¶83. Defendant's motion simply ignores this highly similar, and highly inculpatory, pattern of misconduct that Plaintiff clearly alleged in the Complaint.

Beginning in or about 2016, UBS's employee Brian Edgar notified numerous

---

[4] This misconduct is highly similar to that at issue here, as both relate to UBS's incorrect tax information reporting for municipal bonds, which harmed clients. The misconduct at issue here is distinct in that it relates specifically to incorrect tax information reporting of amortizable bond premium for taxable municipal bonds.

UBS employees of UBS's failure to report amortizable bond premium for taxable municipal bonds, including his director, his compliance manager, senior management, the municipal bond trading group, the municipal bond underwriting group, and the tax group. ¶¶91-92. Yet UBS took no corrective action whatsoever for approximately three years, and even then its belated response consisted of half-measures insufficient to repair the harm it had caused. ¶¶93, 99.

UBS's failure to address admitted, systemic deficiencies in its tax information reporting for municipal bonds, and its failure to act on repeated warnings that it was not reporting amortizable bond premium for taxable municipal bonds, was arbitrary and irrational, and displayed reckless indifference to the harm suffered by its clients. *See Security Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 819 (2d Cir. 2014) (defendant's refusal to revise calculation to correct suspect numbers could give rise to breach of the implied covenant of good faith and fair dealing); *cf. Banco Multiple Santa Cruz, S.A. v. Moreno*, 888 F. Supp. 2d 356, 366 (E.D.N.Y. 2012) (upholding implied covenant claim because investors reasonably expect financial institutions to "employ reasonable procedures" to safeguard against fraud). UBS's misconduct deprived its clients of the reasonably expected benefits of their contracts with UBS, in which it instructed them to "[p]lease rely only on your year-end tax forms . . . when you prepare your tax return." Agreements and Disclosures booklet at 12.

## A.   Plaintiff's Implied Covenant Claim Involves Conduct Distinct From The Express Contract Claim

UBS erroneously argues that Plaintiff's implied covenant claim should be dismissed as duplicative of his claims for breach of express contract terms. On the contrary, Plaintiff's implied covenant claim is based on distinct facts and a distinct theory. *See Durr Mech. Constr., Inc. v. PSEG Fossil, LLC*, 516 F. Supp. 3d 407, 417 (D.N.J. 2021) (McNulty, J.) (denying motion to dismiss implied covenant claim as duplicative where it went "beyond allegations that [defendant] simply violated a contract term"). Plaintiff's claim for breach of express terms is premised on UBS's explicit promise to report amortizable bond premium to clients. *See* ¶¶126, 128; *see supra* Part II.C. That claim merely requires Plaintiff to allege that UBS failed to report amortizable bond premium as promised, and its good or bad faith is irrelevant.

In contrast, Plaintiff's claim for breach of the implied covenant is not based *merely* on UBS's failure to report amortizable bond premium standing alone. Rather, this claim alleges that UBS's failure resulted from its arbitrary, irrational, and recklessly indifferent misconduct. *See Dalton*, 87 N.Y.2d at 389; *Security Plans*, 769 F.3d at 819. This claim relies on facts regarding UBS's admitted systematic deficiencies in municipal bond tax information reporting (¶¶76-85), and regarding Mr. Edgar's efforts to have UBS fix its broken tax information reporting for amortizable bond premium (¶¶89-93). The implied covenant claim does not depend on Forms 1099 or guides to Form 1099 being part of the contract between UBS and

its clients, and may succeed even if the Court finds no express term was breached. *See Prakhin*, 122 A.D.3d at 602. The implied covenant claim depends on different facts and legal theories from the express breach claim.

### B. Plaintiff's Claims For Breach Of The Implied Covenant And Express Terms Should Be Considered In The Alternative

UBS's argument that the implied covenant claim should be dismissed as duplicative fails for the additional reason that these claims are properly considered in the alternative at the pleading stage. Under Rule 8 claims may be pled in the alternative, and even inconsistent claims may be pled. Fed. R. Civ. P. 8(d)(2)-(3). For this reason, "[a]t the pleading stage, Plaintiff is not required to guess whether it will be successful on its contract, tort, or quasi-contract claims," but may properly assert them all as alternatives. *St. John's Univ., New York v. Bolton*, 757 F. Supp. 2d 144, 183 (E.D.N.Y. 2010); *see also China Falcon Flying Ltd. v. Dassault Falcon Jet Corp.*, 2016 WL 1394437, at *2 (D.N.J. Apr. 8, 2016) (McNulty, J.) ("I will permit the pleading of alternative theories at this early stage. . . They are simply different lenses through which to view the same set of facts").

Similarly, "[t]he law in New York is that a party may assert causes of action in both breach of contract and quasi-contract where there is a bona fide dispute concerning existence of a contract or whether the contract covers the dispute in issue," as is plainly the case here. *Courtien Commc'ns, Ltd. v. Aetna Life Ins. Co.*, 193 F. Supp. 2d 563, 571 (E.D.N.Y. 2002). As such, "[a] claim for breach of contract

does not preclude a party from bringing a claim for breach of the implied covenant of good faith and fair dealing when they are brought in the alternative." *Fantozzi v. Axsys Techs., Inc.*, 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008).

Moreover, at the pleading stage when the Court must "draw all inferences from the facts alleged in the light most favorable" to the plaintiff, *Phillips*, 515 F.3d at 228, and "[p]leadings must be construed so as to do justice," Fed. R. Civ. P. 8(e), claims may be treated by the Court as pled in the alternative even if not specifically identified as such in the complaint. *Adler v. Pataki*, 185 F.3d 35, 41 (2d Cir. 1999) ("Although these allegations were not specifically pleaded as 'in the alternative,' we have ruled that Rule 8(e)(2) offers sufficient latitude to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party"); *see also St. John's*, 757 F. Supp. 2d at 183. Therefore, Plaintiff's implied covenant claim should be considered as made in the alternative to his claim for breach of express terms, and the implied covenant claim should not be dismissed as duplicative at this early stage of litigation.

## IV.    The Economic Loss Rule Does Not Bar Plaintiff's Tort Claims

UBS's primary argument regarding Plaintiff's tort claims is that they are supposedly barred as duplicative of his contract claims under the economic loss rule. This argument is premature at the pleading stage when Plaintiff may advance tort and contract claims in the alternative, and it is plainly contradicted by UBS's

argument that its contracts do not cover the alleged misconduct. UBS's economic loss argument also fails on the merits because Plaintiff's tort claims arise from extra-contractual duties that UBS owed its clients. Moreover, while Plaintiff disagrees that the economic loss rule even applies here, New York excepts from its application negligent misrepresentation claims such as those advanced by Plaintiff.

### A.   UBS Owes Its Clients Extra-Contractual Duties, To Which The Economic Loss Rule Does Not Apply

UBS wrongly argues that the economic loss rule automatically bars any and all tort claims in cases also involving contract claims. UBS's argument misunderstands the limited scope of the rule which does not apply to cases involving extra-contractual duties, such as those at issue here. "A person is not necessarily insulated from liability in tort merely because he or she is engaged in performing a contractual obligation." *Landon v. Kroll Lab'y Specialists, Inc.*, 91 A.D.3d 79, 83 (N.Y. App. Div. 2011), *aff'd*, 22 N.Y.3d 1 (N.Y. 2013). "Where an independent tort duty is present, a plaintiff may maintain both tort and contract claims arising out of the same allegedly wrongful conduct." *Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012). Furthermore, "[t]he very nature of a contractual obligation, and the public interest in seeing it performed with reasonable care, may give rise to a duty," which "will give rise to a tort claim." *Banco Multiple*, 888 F. Supp. 2d at 368.

Here, Plaintiff alleges grounds for UBS's duties to clients arising from the

nature of their relationship, independent of UBS's contracts. UBS is part of one of the world's largest and most sophisticated financial institutions, whereas its clients are predominantly individual investors. ¶¶12, 14. Treasury Regulations require UBS to report amortizable bond premium to its clients. IRC Section 6049(c); 26 C.F.R. § 1.6049-9(b); ¶¶37-42. UBS exercises control over the tax information reporting for its clients' accounts. ¶¶138, 144. UBS has special knowledge regarding its clients' tax information relating to securities owned in their accounts due to its role as their broker. ¶139. Clients rely on UBS, placing a high level of trust and confidence in UBS in matters of tax information reporting, and UBS understands that clients rely on the tax information it provides. ¶¶138-39. Therefore, as further discussed *infra* in Parts V-VI, UBS owes its clients fiduciary duties and duties of reasonable care with respect to matters of tax information reporting.

That UBS owes such duties to its clients is further supported by the actions of FINRA with respect to UBS's pattern of erroneous tax information reporting. FINRA is a self-regulatory organization through which brokerages such as UBS seek to ensure that "the broker-dealer industry operates fairly and honestly," and that "every investor receives the basic protections they deserve."[5] ¶77. In connection with FINRA enforcement actions UBS has twice publicly agreed to compensate its clients for harm caused by its inaccurate tax information reporting, and even to

---

[5] *See* About FINRA, https://www.finra.org/about (last visited Jan. 25, 2022).

intercede with the IRS on their behalf to avoid further harm. ¶¶114-18. This shows the brokerage industry itself expects, and indeed requires, its members to provide accurate tax information reporting to clients. This further confirms the well-founded expectations of UBS's clients that UBS would undertake reasonable efforts to provide accurate tax information reporting that clients could rely upon. These facts give rise to actionable duties from UBS to its clients, separate and apart from any contractual duties, and to which the economic loss rule does not apply.

**B.    The Economic Loss Rule Does Not Bar Plaintiff's Tort Claims Because This Is Not A Product Liability Action**

UBS wrongly argues that the economic loss rule automatically bars all tort claims in cases also involving economic losses as opposed to physical injury. UBS's argument once again misunderstands the limited scope of the rule. The case that established New York's economic loss rule merely "stands for the proposition that an end-purchaser of a product is limited to contract remedies and may not seek damages in tort for economic loss against a manufacturer." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 288 (N.Y. 2001). "The rule developed as a way of enforcing the dictates of privity in product liability law," and "the majority of cases enunciating the economic loss rule have arisen in the context of product liability." *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 16 (2d Cir. 2000) (cleaned up). The economic loss rule "is not always applied in negligence cases." *Id.* For example, the rule allows recovery for economic losses in

tort in cases "involving liability for the violation of a professional duty." *Id.* at 18.

While the rule may operate to bar product liability tort claims, "[t]hat *per se* bar, however, does not apply outside of that context." *Emerald Town Car of Pearl River, LLC v. Philadelphia Indem. Ins. Co.*, 2017 WL 1383773, at *4 (S.D.N.Y. Apr. 12, 2017). "Rather, New York courts perform a traditional tort analysis to determine whether the asserted negligence claims based on economic loss alone fall beyond the scope of the duty owed them by [the] defendants." *Id.* (citing *532 Madison Ave.*, 96 N.Y.2d at 292). This traditional tort analysis entails the Court's balancing of numerous factors, "including the reasonable expectations of parties and society generally." *532 Madison Ave.*, 96 N.Y.2d at 288. "At its foundation, the common law of torts is a means of apportioning risks and allocating the burden of loss," and as such, "[a] duty may arise from a special relationship that requires the defendant to protect against the risk of harm to plaintiff." *Id.* at 288-89.[6]

Here, there is no *per se* bar to Plaintiff's tort claims because this is not a product liability case. UBS owes duties to its clients under a traditional tort analysis because*, inter alia*, consumers of financial services would expect UBS to make

---

[6] In accord with these principles, "[i]t is not uncommon for investment companies to be liable to their investor-customers in tort," notwithstanding the existence of contracts between such companies and their customers or the economic nature of the harm at issue. *Banco Multiple*, 888 F. Supp. 2d at 370 (collecting cases). For example, New York common law "hold[s] banks liable for negligently paying out on forged withdrawal slips." *See id.* at 371-72.

reasonable efforts to provide accurate tax information reporting to its clients. Furthermore, UBS is better positioned than its clients to bear the burden and risk of its own incorrect tax information reporting, since such matters are within UBS's exclusive control and within its specialized knowledge as a large, sophisticated financial institution that routinely provides tax information reporting to clients.

The economic loss rule simply does not apply on these facts, and Plaintiff's plausibly pled tort claims should proceed to resolution on their merits.

### C. New York's Exception For Negligent Misrepresentation Claims Applies Here

While the economic loss rule does not apply here, even if it did, New York recognizes an exception allowing recovery of economic losses for negligent misrepresentation claims in circumstances where, as here:

> there is carelessness in imparting words upon which others were expected to rely and upon which they did act or failed to act to their damage, provided that such information was expressed directly, with knowledge or notice that it will be acted upon, to one to whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all.

*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 420 F. Supp. 3d 123, 139 (S.D.N.Y. 2019); *Emerald Town Car*, 2017 WL 1383773, at *5; *Parrott v. Coopers & Lybrand, L.L.P.*, 95 N.Y.2d 479, 483 (N.Y. 2000).

This exception is met here because (i) UBS carelessly misrepresented the amortizable bond premium attributable to clients' investments, (ii) UBS expected

and knew that its clients would rely on the tax information it reported, (iii) UBS's clients relied on the incorrect tax information supplied by UBS when completing their own tax returns and were damaged thereby, and (iv) UBS owed contractual, fiduciary, and other duties to all of its clients. *See White v. Guarente*, 43 N.Y.2d 356, 361, 372 N.E.2d 315 (N.Y. 1977) (accountant may be liable to investors for economic losses caused by negligent misrepresentations in partnership audit and tax returns where an investor "would necessarily rely on or make use of the audit and tax returns . . . in order to properly prepare his or her own tax returns").

### D.    Plaintiff's Tort Claims Should Be Considered In The Alternative To His Contract Claims

As was true for Plaintiff's claims for breach of express contract terms and breach of the implied covenant of good faith and fair dealing, Plaintiff's contract and tort claims should also be considered in the alternative at the pleading stage. Fed. R. Civ. P. 8(d)(2); *Adler*, 185 F.3d at 41. Under New York law, "the economic loss doctrine does not prohibit Plaintiffs from pleading contractual and tort claims in the alternative." *Tobia v. United Grp. of Companies, Inc.*, 2016 WL 5417824, at *25, n.19 (N.D.N.Y. Sept. 22, 2016); *see also Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 414 (S.D.N.Y. 2010) ("the Court views Plaintiffs' tort claims as alternative pleadings in the event that their contract claims fail").

Alternative pleading of contract and negligence claims is valid because the mere "possibility that [plaintiff] may recover in contract does not require dismissal

of his tort claim." *Banco Multiple*, 888 F. Supp. 2d at 367; *see also Howmedica Osteonics Corp. v. NuVasive, Inc.*, 2018 WL 6011936, at *5 (D.N.J. Nov. 15, 2018) (McNulty, J.) ("the Economic Loss Rule may dictate that the plaintiff cannot prevail under both theories; but . . . That determination can await summary judgment").

## V.     UBS Owed Plaintiff, The Class, and Its Other Clients Fiduciary Duties With Respect To Tax Information Reporting

UBS owed its clients fiduciary duties with respect to tax information reporting because UBS exercised control over these matters, and clients trusted and relied on UBS in these matters. UBS's arguments to the contrary misapply decisions analyzing fiduciary duties in the context of investment decisions, and ignore the Complaint's relevant factual allegations. Plaintiff has more than plausibly alleged that UBS owed, and breached, fiduciary duties to its clients.

### A.     This Case Is About Tax Information Reporting, Not Investment Decisions

UBS makes the sweeping, and unsupportable, claim that a broker cannot owe its client any fiduciary duties unless the broker has investment discretion over the client's account. While it is undoubtedly true that a broker owes no fiduciary duties *for the client's investment decisions* to a client with a self-directed account, this in no way precludes other fiduciary duties arising from other aspects of the broker-client relationship. UBS fails to recognize that the cases it cites in support of its argument involved plaintiffs challenging investment-related conduct, unlike the

present case which relates to UBS's tax information reporting.

Contrary to UBS's argument, "a discretionary account is *not* the sole means by which a fiduciary duty may be created in the context of a broker-customer relationship." *United States v. Wolfson*, 642 F.3d 293, 295 (2d Cir. 2011) (emphasis added). Rather, "[t]he relationship between a stockbroker and its customer is that of principal and agent and is fiduciary in nature, according to New York law." *Conway v. Icahn & Co.*, 16 F.3d 504, 510 (2d Cir. 1994). "[A] relationship of trust and confidence does exist between a broker and a customer with respect to those matters that have been entrusted to the broker." *United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002). "This relationship places an affirmative duty on brokers to use reasonable efforts to give the customer information relevant to the affairs that have been entrusted to them." *Id.* (cleaned up).

Because UBS's clients entrusted it with matters of tax information reporting, UBS owed them actionable fiduciary duties to make reasonable efforts to provide accurate tax information. UBS's mere status as a broker does preclude the existence of these fiduciary duties. *See Salomon Bros., Inc. v. Huitong Int'l Tr. & Inv. Corp.*, 1996 WL 675795, at *3 (S.D.N.Y. Nov. 21, 1996) (denying motion to dismiss fiduciary duty claim where plaintiff "has alleged both that Salomon acted as its broker and that Salomon failed to provide it with relevant information").

32

**B.      The Complaint States A Claim For Breach Of Fiduciary Duties**

"To state a claim for breach of fiduciary duty under New York law, a plaintiff must allege (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Tobia*, 2016 WL 5417824, at *21 (N.D.N.Y. Sept. 22, 2016). UBS only contests the first element—the existence of a fiduciary relationship.[7] "A fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Id*. Fiduciary duties are present where "one party reasonably trusted another." *St. John's*, 757 F. Supp. 2d at 166. The existence of a fiduciary duty is a fact-specific inquiry to be determined on a case-by-case basis. *Id.*

Where a contractual relationship exists, New York courts look first to that agreement, "to discover . . . the nexus of the parties' relationship and the particular contractual expression establishing the parties' interdependency." *Id.* (cleaned up). "[T]he existence of a contract between the parties defining the broad contours of their relationship does not preclude a finding of a fiduciary relationship." *Id.* "To the

---

[7] The other two elements are easily met here. UBS's misconduct in breach of its fiduciary duties includes failing to make reasonable efforts to report accurate tax information to them, and failing to promptly investigate and correct suspected errors in its tax information reporting. Plaintiff and the class of UBS clients were damaged as a result of UBS's breach by, *inter alia*, making tax overpayments in reliance on UBS's erroneous tax information reporting.

contrary, a contract may create a fiduciary relationship," if it "establishes a relationship of trust and confidence between the parties." *Id.* The contracts between UBS and its clients establish precisely such a relationship of trust and confidence with respect to tax information reporting. *See* Agreements and Disclosures at 12 ("Please rely only on your year-end tax forms"); i*d.* at 3 ("our services are not limited to taking customer orders and executing securities transactions"); *id.* ("As your broker-dealer, we have a duty to deal fairly with you.").

The inquiry into the existence of a fiduciary duty is not limited to the parties' contracts, but entails analysis of their entire relationship to ascertain "whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge." *St. John's*, 757 F. Supp. 2d at 167. As detailed *supra* in Part IV.A, a special relationship exists between UBS and its clients. Clients entrusted tax information reporting to UBS, and placed a high degree of trust and confidence in UBS in such matters. ¶138. Tax information reporting was within UBS's exclusive control, and UBS has special knowledge regarding tax information for securities owned in clients' accounts due to UBS's role as their broker. ¶139. UBS has superior knowledge and expertise in tax information reporting because it is part of one of the world's largest and most sophisticated financial institutions, whereas its clients are predominantly individual investors. ¶¶12, 14. Therefore, UBS owes its clients actionable fiduciary duties with respect to its tax information reporting.

## VI.   UBS Owed Its Clients A Duty Of Reasonable Care With Respect To Tax Information Reporting

Like UBS's fiduciary duties, UBS also owed Plaintiff and the Class a duty of reasonable care with respect to tax information reporting because UBS exercised control over such matters, and clients reasonably trusted and relied on UBS to do so. UBS's arguments as to Plaintiff's negligence claims simply rehash its disproven contentions regarding the economic loss rule and the existence of fiduciary duties.[8] The Complaint pleads viable claims for negligence and negligent misrepresentation.[9]

### A.   The Complaint States A Claim For Negligence

To state a claim for negligence a plaintiff must allege "(1) that the defendant owed him or her a cognizable duty of care; (2) that the defendant breached that duty; and (3) that the plaintiff suffered damage as a proximate result of that breach." *Di Benedetto v. Pan Am World Serv., Inc.*, 359 F.3d 627, 630 (2d Cir. 2004). Once again, UBS only disputes the first element—existence of a duty.

"[T]he definition of the existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for Judges." *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 585 (N.Y. 1994). It depends on factors "including logic, science, weighty competing socioeconomic policies and

---

[8] As discussed *supra* in Part IV.D, Plaintiff's tort claims should be considered in the alternative to his contract claims.

[9] Plaintiff will not further pursue his negligence per se claim (Count VI).

sometimes contractual assumptions of responsibility." *Id.* "These sources contribute to pinpointing and apportioning of societal risks and to an allocation of burdens of loss and reparation on a fair, prudent basis." *Id.* "The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 344 (N.Y. 1928).

Here, numerous factors all weigh in favor of recognizing a duty of reasonable care owed by UBS to its clients in matters of tax information reporting. For example, harm to the clients was reasonably foreseeable because, as a matter of common sense and experience, clients rely on tax information provided by their brokers when filing their own taxes. Clients reasonably expected UBS to exercise care in reporting tax information to them because providing such information is a routine, and even statutorily required, part of UBS's business. Moreover, UBS is a sophisticated financial institution employing numerous lawyers, accountants, and tax professionals. From an economic point of view it is simply more efficient to require UBS to exercise reasonable care when providing tax information than to require hundreds of thousands of individual clients to second guess and re-calculate every number on their tax forms. And UBS and its clients have a contractual relationship, which serves to narrowly and precisely circumscribe the group to which UBS's duty is owed, avoiding any potential concerns about the scope of liability.

Though the existence of a duty of care with respect to tax information reporting under New York law seems to be a novel question, several courts have recognized that providers of tax information reporting owe such a duty to recipients. In *Smith v. Bank of America, N.A.*, plaintiff home mortgage borrowers alleged that the defendant bank improperly reported their interest payments on IRS Form 1098. 2018 WL 6071048, at *1 (C.D. Cal. July 2, 2018). The court denied the bank's motion to dismiss, finding the relevant factors, including foreseeability of harm to the plaintiffs, "favor imposing a duty of care." *Id.* at *5; *see also Raley v. Bank of Am., N.A.*, 2014 WL 6684906, at *4 (N.D. Ala. Nov. 25, 2014) (reasoning that foreseeable harm from bank's erroneous tax information reporting on IRS Form 1099-C would give rise to duty actionable in negligence).

And in *Clemens v. USV Pharm.*, the Fifth Circuit upheld negligence claims by an employee against an employer who provided an erroneous IRS Form W-2, holding that filers of information returns "have a duty to act with reasonable promptness to correct erroneous information they have sent to the IRS when such errors come to their attention." 838 F.2d 1389, 1395 (5th Cir. 1988); *see also Buchanan v. Dowdy*, 772 F. Supp. 968, 974 (S.D. Tex. 1991) ("Dowdy was negligent in that he failed to correct the erroneous Form 1099.").

In accord with these authorities and relevant policy considerations, UBS owed a duty of reasonable care to its clients in matters of tax information reporting.

**B.     The Complaint States A Claim For Negligent Misrepresentation**

The elements for a negligent misrepresentation claim are that:

> (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Hydro Invs.*, 227 F.3d at 20. Once again, UBS only challenges the first element. As an initial matter, "the standard of a special relationship in the context of a negligent misrepresentation claim is less rigorous than that of a fiduciary duty," and so this element is satisfied, *a fortiori*, for the same reasons that UBS owes its clients fiduciary duties as discussed above. *Anwar*, 728 S. Supp. 2d at 416; *see supra* Parts IV.A and V.B.

The existence of a special relationship for purposes of negligent misrepresentation claims turns on "[w]hether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (N.Y. 1996). This in turn raises fact issues concerning, "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied

it for that purpose." *Id.*

While "a determination of whether a special relationship exists is highly fact-specific and generally not susceptible to resolution at the pleadings stage," the test is easily met here. *Anwar*, 728 F. Supp. 2d at 416. As a broker, UBS holds special expertise in tax information reporting for investment securities. Clients trusted UBS to supply accurate tax information reporting. And UBS was plainly aware that its clients would use the Forms 1099 it supplied to file their own tax returns. *See* Agreements and Disclosures at 12 ("Please rely only on your year-end tax forms and order confirmations when you prepare your tax return."). As such, the requisite special relationship exists, and UBS is liable to its clients for negligently misreporting their amortizable bond premium.

## VII.   UBS Is Liable For Punitive Damages

UBS argues that, as a technical matter, a separate cause of action cannot be maintained for punitive damages. But UBS does not otherwise argue that Plaintiff cannot recover punitive damages on the facts here. Whether Plaintiff's punitive damages allegations are considered as a separate cause of action or as part of his prayer for relief is irrelevant. *See* Fed. R. Civ. P. 8(e); *Bullock v. Borough of Roselle*, 2018 WL 4179481, at *11 (D.N.J. Aug. 31, 2018) (McNulty, J.) (deferring consideration of punitive damages pled as a separate cause of action until summary judgment or trial). UBS's decision to ignore repeated warnings from its own

employee of the harm it caused to clients amply demonstrates the willful and wanton disregard necessary to plead entitlement to punitive damages. *See* ¶¶89-93, 159-63.

## VIII.  The Court Should Grant Leave To Amend, If Necessary

If the Court grants any part of UBS's motion, Plaintiff requests leave to amend. "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "This liberal amendment philosophy limits the district court's discretion to deny leave to amend," to cases involving undue delay, bad faith, or prejudice, none of which apply here. *Adams v. Gould Inc.*, 739 F.2d 858, 864 (3d Cir. 1984). While Plaintiff believes his claims are plausibly pled, he should be granted an opportunity to re-plead to cure any deficiencies identified by the Court.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion should be denied. If the motion is granted, Plaintiff requests leave to amend.

DATED: January 26, 2022                    **GLANCY PRONGAY & MURRAY LLP**

By: */s/ Lee Albert*
Lee Albert (State Bar No. 26231986)
*lalbert@glancylaw.com*
230 Park Ave, Suite 358
New York, New York 10169
(212) 682-5340

Garth A. Spencer
  (admitted *pro hac vice*)
*gspencer@glancylaw.com*
1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 201-9150

**GOODMAN HURWITZ & JAMES, P.C.**
William H. Goodman
  (*pro hac vice* application forthcoming)
*bgoodman@goodmanhurwitz.com*
1394 E Jefferson Ave
Detroit, MI 48207
(313) 567-6170

*Attorneys for Plaintiff Richard*
*Goodman and the Proposed Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 26, 2022, I electronically filed a true and correct copy the foregoing document with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record who have consented to electronic notification.

*/s/ Lee Albert*
Lee Albert