UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

**RICHARD GOODMAN, individually and as trustee of the Richard M. Goodman revocable living trust, and on behalf of all others similarly situated,**

   **Plaintiff,**

   v.

**UBS FINANCIAL SERVICES, INC.,**

   **Defendant.**

Civ. No. 21-18123 (KM) (MAH)

OPINION

**KEVIN MCNULTY, U.S.D.J.:**

Sometime before 2014, Richard Goodman purchased a significant number of taxable municipal bonds, which he held in a brokerage account controlled by defendant UBS Financial Services, Inc. ("UBS"). Goodman alleges that for the tax years between 2015 and 2018, UBS incorrectly reported the amount of the amortized bond premiums on his 1099 Tax Form, causing him to significantly overpay his federal taxes. Goodman brings contract and tort claims on behalf of himself and similarly situated individuals and UBS now moves to dismiss. (DE 13.)[1] For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

**I.   BACKGROUND**

Richard Goodman purchased at a premium a number of taxable municipal bonds issued by the states of Michigan and Texas that he held in his

---

[1]   Certain citations to the record are abbreviated as follows:

   DE = docket entry in this case

   Compl. = Complaint (DE 1)

   Mot. = UBS's motion to dismiss (DE 13)

   Opp. = Goodman's Brief in opposition to UBS's motion to dismiss (DE 16)

brokerage account at UBS. (Compl. ¶ 94.) His relationship with UBS was governed by a Client Relationship Agreement ("CRA"). (*Id.* ¶ 47; DE 13-2, Ex. A.) The CRA incorporates by reference an "Agreements and Disclosures Booklet" and states, "We refer to the Client Relationship Agreement together with all other agreements and disclosures that we make available to you, and any amendments, as our 'Agreement' with you for your Accounts. (DE 13-2, Ex. A at 1.) It also states, "This Client Relationship Agreement and the related documents, including the General Terms and Conditions and the rest of the Agreements and Disclosures booklet form the entire 'Agreement' between you and UBS Financial Services Inc." (*Id.* at 13.) "Related documents" is not defined any further. The CRA allows for modification, stating "We may change our Agreement with you at any time by sending you a written notice of the change, and the changes will be effective on the date of the notice unless we specify a later date. We also may cease to offer services at any time without prior notice. Your continued use of your Accounts and our products and services constitutes your acceptance of the new terms and conditions." (*Id.*) Finally, the CRA contains provisions for the electronic delivery of tax forms, specifically mentioning Form 1099. (*Id.* at 14.) In addition, the Agreements and Disclosures Booklet discusses tax forms. For example, in a section detailing UBS's cost basis policy, it warns clients not to use their monthly account statements in filing taxes but rather to instructions clients to "rely only on your year-end tax forms and order confirmations when you prepare your tax return." (DE 13-3 at 12.) Nothing in the CRA or Agreement and Disclosures Booklet addresses UBS's tax reporting policies related to municipal bonds. In addition, the CRA states that it is governed by the laws of New York. (Compl. ¶ 58.)

When bonds are purchased at a premium, *i.e.*, at more than their face value, 26 U.S.C. § 171 allows the premium to be amortized over the remaining life of the bond to reduce the bondholder's taxable income. (*Id.* ¶ 30.) Federal regulations govern how financial institutions report their clients' income to the Internal Revenue Service and require such information to be shared with the

clients. (*Id.* ¶ 33.) Treasury Department regulations state that unless a client indicates in writing that he or she does not wish to amortize the premium, "the broker must report the amount of any amortizable bond premium allocable to a stated interest payment made to the customer during the calendar year" on Form 1099-INT. (*Id.* ¶ 38.) The broker may either report both the gross amount for interest and the bond premium, or may subtract the premium from the interest to calculate a net amount. (*Id.* ¶ 38, 40.) These regulations were reflected in UBS's Form 1099 Guide, which the bank provided to clients. (*Id.* ¶ 60.) The 2017 Guide states, "For a covered security acquired at premium, unless you notified UBS in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to amortize the premium under section 171, we will report a gross amount for both the interest paid to you and the premium amortization for the year." (*Id.* ¶ 63.)

Goodman alleges that instead of following the policy set out in the Form 1099 Guide, the Form 1099s that UBS provided to him, included only the amount of interest, without including the amortizable bond premium, either as a gross amount or as part of a net calculation. (*Id.* ¶ 86.) Eventually, Goodman convinced UBS to provide him with corrected 1099 Forms for the years 2015–2018. (*Id.* ¶ 86–104.) The corrected Forms revealed that the original forms had overstated Goodman's income by $200,868.34 during those four years. (*Id.* ¶ 104.) Goodman alleges that he was not alone in this and UBS had made the same mistake with the 1099 Forms of the absent class members (*Id.* ¶ 108–13.) He also alleges that in FINRA Letters of Acceptance, Waiver and Consent from 2015 and 2019 UBS admitted to systemic errors tax reporting related to municipal bonds. (*Id.* ¶ 76–85, 114.)

Goodman filed this case on October 5, 2021. (DE 1.) His complaint includes seven Counts. Those Counts are:

1. Breach of contract.
2. Breach of implied covenant of good faith and fair dealing.
3. Breach of fiduciary duty.
4. Negligent misrepresentation.
5. Negligence.

6. Negligence per se.
7. Punitive damages.

(*Id.* ¶ 125–63.) Goodman has abandoned Count 6 (Opp. at 35 n. 9) and punitive damages are a remedy, not a cause of action, *Hassoun v. Cimmino*, 126 F. Supp. 2d 353, 372 (D.N.J. 2000). Consequently, those two Counts will be dismissed, leaving Counts 1–5. Counts 1 and 2 sound in contract and Counts 3, 4, and 5 sound in tort. UBS moved to dismiss on December 22, 2021. (DE 13.) Goodman filed a brief in opposition (DE 16) and UBS filed a reply (DE 21). This motion is fully briefed and ripe or decision.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trs. Thereof v. Tishman Constr. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Civil Procedure 8(a) does not require that a pleading contain detailed factual allegations, but it must assert "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must raise a claimant's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570. That standard is met when "factual content [] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim. The defendant bears the burden to show that no claim has been stated. *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016). I accept facts in

the complaint as true and draw reasonable inferences in the plaintiff's favor. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc).

### III. DISCUSSION

Goodman seeks to hold UBS liable under both contract and tort theories. Most of these theories fail as a matter of law, but I find that Goodman has plausibly stated a claim with regard to Counts 1 and 5. Goodman may eventually be forced to choose between these two theories, but that point has not yet been reached. Federal Rule of Civil Procedure 8 permits alternative pleading and inconsistent pleading. *See City of Almaty, Kazakhstan v. Ablyazov,* No. 15-CV-5345 (AJN), 2019 WL 1430155, at *5 (S.D.N.Y. Mar. 29, 2019). It is entirely possible that information revealed in discovery will make either Count 1 or 5 untenable, but for now both claims will go forward.

#### a. Contract Counts

Goodman two contract theories. I find that Goodman has stated a claim for breach of contract because is an implied term of the CRA that UBS will provide accurate tax forms in accordance with its stated policies and therefore decline to dismiss Count 1. I find, however, that his claim for breach of the implied covenant of good faith and fair dealing fails and therefore dismiss Count 2.

##### 1. Breach of contract

Goodman argues that by failing to include the bond premium on the Form 1099s that UBS provided to him, UBS breached the CRA. This argument is relatively difficult for Goodman to make because the CRA makes no promises related to how tax information will be reported for municipal bonds. The only place such a policy is laid out is in the 1099 Guide, which states "unless you notified UBS in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to amortize the premium under section 171, *we will report* a gross amount for both the interest paid to you and the premium amortization for the year." (Compl. ¶ 63 (emphasis added).)

Goodman attempts to argue that the Guide is itself part of the contract, but these arguments fail. First, the Guide is not incorporated by reference. To be incorporated by reference, a document must be "identified beyond all reasonable doubt." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996). Here, Goodman attempts to argue that references in the CRA to "disclosures" incorporates the Guide by reference. (Opp. at 8.) This argument fails. Even if the Guide did qualify as a disclosure, there is no indication in the CRA that the Guide, specifically, was meant to be incorporated. What is more, the CRA states "By maintaining your Accounts at UBS, you agree to these terms and conditions and the other agreements and disclosures we *refer to here*." (Compl. ¶ 50.) The CRA does not "refer to" the Guide in any way. I thus find that the Guide was not incorporated by reference.

Next, Goodman argues that the Guide constituted a modification of the CRA. (Opp. at 10–11.) The CRA allows for modifications if UBS sends the client "notice of the change." (DE 13-2, Ex. A at 13.) There is no evidence, however, that anything in the Guide provided notice that it was a modification of the contract. Rather it appears to be a UBS policy document that was provided to clients independently of the CRA. To hold otherwise would be to make every document provided by UBS to clients a part of the CRA even if UBS had no intention of modifying the CRA. I therefore find that the provision to Goodman of the guide did not modify the CRA.

I find, however, that Goodman has plausibly alleged that UBS violated two interrelated implied terms of the CRA. I find that it is implied in the CRA that UBS will provide *accurate* tax forms and that UBS will follow its stated policies in providing tax forms.

"In order that an unexpressed term may be implied and inserted in a contract, the implication must arise from the language employed in the expressed terms of the contract, or be indispensable to effectuate the intention of the parties" *Park Ave. Assocs. in Radiology, P.C. v. Nicholson*, 200 A.D.3d 1436 (2021), aff'd, No. 62 SSM 13, 2022 WL 1571577 (N.Y. May 19, 2022)

(quoting *Matter of Robinson v. Estate of Hayes*, 202 N.Y.S. 732 (1924)). Here, the implication arises from the expressed terms of the contract. The CRA clearly contemplates that UBS would provide Goodman with tax forms, including Form 1099. Given that UBS is required by law to do so, this is not surprising. But to be meaningful, a promise to provide the client with tax forms implies that the forms be accurate to the best of the bank's knowledge. UBS cannot fulfill its contractual obligations to its clients by simply mailing (or e-mailing) a piece of paper labeled "1099 Form" that reports income amounts unrelated to the client's holdings. I find that Goodman has plausibly alleged that the Form 1099s issued to him by UBS were inaccurate.

Of course, what constitutes an accurate form is not always clear. There may be occasions where there are multiple acceptable ways to report income, and some clients may prefer their income to be reported one way while others prefer it to be reported a second way. It is implied, however, that in determining how to report income, UBS will follow its own written policies, even if those policies are not themselves part of the CRA. A client who wonders how his or her income will be reported would naturally look for answers in the materials provided by UBS and would expect UBS to follow those policies. Here, UBS's 1099 Guide stated "unless you notified UBS in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to amortize the premium under section 171, we will report a gross amount for both the interest paid to you and the premium amortization for the year." (Compl. ¶ 63.)[2] The contract implies, therefore, that the Form 1099 that UBS was contractually and legally obligated to provide to clients such as Goodman would "report a gross amount for both the interest paid to you and the premium amortization for the year." Goodman alleges that the Form 1099s provided to him did not report the premium amortization for that year and therefore has plausibly alleged a breach of contract.

---

[2] The fact that these policies mirror federal law is not directly relevant to this analysis.

UBS puts forward two main arguments against this conclusion, but both fail. First, UBS argues that this court should follow the Ninth Circuit's decision in *Strugala v. Flagstar Bank, FSB*, which upheld the dismissal of a somewhat similar claim because the plaintiff's "contract with Flagstar contained no express terms concerning Flagstar's mortgage interest reporting practices." 839 F. App'x 69, 71 (9th Cir. 2020). That case involved a plaintiff who obtained a "negative amortization" adjustable-rate mortgage loan and alleged that the defendant misreported the interest paid on the mortgage on Form 1098 and that this misreporting violated an implied term in the contract. *Strugala v. Flagstar Bank, FSB*, No. 5:13-CV-05927-EJD, 2019 WL 2247828, at *1 (N.D. Cal. May 24, 2019), aff'd, 839 F. App'x 69. The implied term, she argued, was that the bank would comply with 26 U.S.C. § 6050H. *Id.* at *5. The United States District Court for the Northern District of California dismissed the breach of contract claim, finding that in contrast to cases in which compliance with a statute had been found to be implied, nothing in the contract referred to the statute. *Id.* at *5–*6. Indeed, it appears that Strugala's mortgage note did not mention tax forms in any way. Leaving aside the fact that the case arose under California contract law and involved a very different contractual context, I do not find *Strugala* persuasive. Here, I find that Goodman's claim is not that UBS was required to follow the law, but rather that the CRA implied an obligation for UBS to provide accurate tax forms that were consistent with its own policies, independent of any requirements of federal law.

Next, UBS argues that the various disclaimers in the CRA relieved it of the contractual obligation to provide accurate tax forms. The CRA does indeed say, as UBS repeatedly mentions, that UBS "does not provide legal or tax advice" and that clients are responsible for fulfilling "all reporting and tax associated obligations." (Mot. at 8–9.) But Goodman does not seek tax advice and recognizes that he is responsible for accurately reporting his income to the IRS. Undoubtedly many UBS clients have accounts with other brokers and banks and UBS cannot, and is not required to, have a full understanding of the

8

clients' tax situations. Goodman has alleged, however, that UBS is contractually required to accurately report the income generated within clients' accounts and that it is required to follow its own policies when doing so. UBS, in contrast, would have me find that its statement that it doesn't give tax advice relieves it of any obligation to correctly report its clients' incomes. I reject that argument and therefore DENY UBS's motion to dismiss Count 1.

### 2. Implied Covenant of Good Faith and Fair Dealing

Goodman has not stated a claim for the violation of the implied covenant of good faith and fair dealing. His claim is solely one of breach of contract—in short he argues that by failing to report the bond premium, UBS did not fulfill its contractual obligations. I therefore GRANT UBS's motion to dismiss Count 2.

Under New York law, there is a covenant of good faith and fair dealing implied in all contracts. See *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (N.Y.2002); *Carvel Corp. v. Diversified Mgmt. Grp.*, 930 F.2d 228, 230 (2d Cir.1991). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002). While the implied covenant of good faith and fair dealing does not "imply obligations inconsistent with other terms of the contractual relationship," it does encompass "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Manhattan Motorcars, Inc. v. Automobili Lamborghini*, 244 F.R.D. 204 (S.D.N.Y.2007) (*quoting Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (N.Y.1983); *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (N.Y.1978)).

"Claims of breach of the implied covenant ... must be premised on a different set of facts from those underlying a claim for breach of contract." *Deutsche Bank Sec. Inc. v. Rhodes*, 578 F.Supp.2d 652, 664 (S.D.N.Y.2008). "A party may maintain a claim for breach of the implied covenant only if the claim

is based on allegations different from the allegations underlying the accompanying breach of contract claim." *Id.* Accordingly, "A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *ICD Holdings S.A. v. Frankel*, 976 F.Supp. 234, 243–44 (S.D.N.Y.1997). In general, a claim of breach of the implied covenant can be made when a party follows the literal terms of a contract, but does so in a manner that injures the other party and denies to it the fruits of the contract. See *Durr Mech. Constr., Inc. v. PSEG Fossil, LLC*, 516 F. Supp. 3d 407, 417 (D.N.J. 2021).

Here, Goodman fails to identify a section of the CRA that UBS adhered to in a way that injured him. Instead, Goodman focuses on the FINRA letters of acceptance, waiver, and consent, and argues that "UBS failed to take reasonable steps to correct known, systemic deficiencies in its tax information reporting for municipal bonds." (Opp. at 20.) In addition, Goodman argues that the breach of the implied covenant claim differs from his breach of contract claim because the latter claim "alleges that UBS's failure resulted from its arbitrary, irrational, and recklessly indifferent misconduct." (Opp. at 22.) This does not change the fact that the core Goodman's claim is the allegation that UBS *failed* to report tax information accurately, as required by the CRA. Even if UBS had been warned by FINRA and its own employees about the issue, the claim is still one of breach of contract, even if that breach could have been prevented by more active compliance procedures. I therefore GRANT UBS's motion to dismiss as to Count 2.

### b. Tort Counts

Goodman also puts forward three tort Counts: breach of fiduciary duty, negligent misrepresentation, and negligence. The breach of fiduciary duty and negligent misrepresentation Counts must be dismissed because Goodman did not properly allege the required heightened duty on behalf of UBS. I will, however, deny UBS's motion to dismiss regarding the negligence claim because

there are factual issues regarding the proper industry standard of care, and because I find that the economic loss rule does not apply because Goodman has alleged an extracontractual duty.

### 1. Breach of fiduciary duty

"Under New York law, as generally, there is no general fiduciary duty inherent in an ordinary broker/customer relationship. Such a duty can arise only where the customer has delegated discretionary trading authority to the broker."[3] *Indep. Ord. of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998) (citations omitted). Here, Goodman has not alleged that he delegated discretionary trading authority to UBS. Rather, Goodman made his own trades through his account.

Goodman argues that he is not claiming that UBS has a fiduciary duty as a maker of investment decisions but rather has such a duty relating to tax information reporting. (Opp. at 31.) He cites only one case for this proposition, but that quarter-century-old unpublished case does not relate in any way to tax reporting. (*Id.* at 32 (citing *Salomon Bros., Inc. v. Huitong Int'l Tr. & Inv. Corp.*, 1996 WL 675795, at *3 (S.D.N.Y. Nov. 21, 1996).) Other cases he cites relate to the duty of brokers to provide accurate information to their clients. This duty, however, relates only to information related to the broker's core purpose of executing trades, not tax reporting. For example, in *United States v. Szur*, a criminal case that Goodman cites, the court found that the convicted brokers were required to disclose the fact that they were receiving 45% to 50% commissions on certain stock sales. 289 F.3d 200, 212 (2d Cir. 2002). Thus, to the degree that there exists a fiduciary duty related to information, it is limited to information *related to the trades* that the client makes.

Because Goodman has not plausibly alleged that there was a fiduciary relationship between him and UBS related to tax information reporting, he

---

[3] In addition, a fiduciary duty might arise in cases where the client is in some way impaired or incapacitated, but no such circumstances are alleged here. See *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1308–09 (2d Cir. 2002).

11

cannot state a claim for breach of fiduciary duty and Count 3 must be dismissed.

### 2. Negligent Misrepresentation

Goodman has also failed to plausibly allege a duty of care that suffices to state a claim for negligent misrepresentation. In the commercial context, as opposed to when the defendant is a professional such as an engineer, "there must be some identifiable source of a special duty of care." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996). Such a special relationship, "requires a closer degree of trust than an ordinary business relationship." *Busino v. Meachem*, 270 A.D.2d 606, 608 (2000). "[L]iability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Kimmell*, 89 N.Y.2d at 263. Goodman has not alleged facts to show that he and UBS had anything other than an ordinary business relationship.

Goodman cites *Kimmell v. Schaefer* to argue that a special relationship can be found because "UBS holds special expertise in tax information reporting for investment securities." (Opp. at 39.) This, however, is plainly untrue. Leaving aside the fact that the "specialized expertise" element is more properly applied to professionals such as engineers or attorneys, UBS has no unique or specialized expertise in tax information reporting. UBS has the same legal obligation to report tax information as any other similar financial institution and Goodman has not pleaded any facts that show that UBS has any particular specialized expertise. Nor, as discussed above, has Goodman pleaded that he had any type of particularly close or trusting relationship with UBS. Goodman was merely one client among many who had a normal business relationship with UBS and he therefore has not stated a claim for negligent misrepresentation and Count 4 must be dismissed.

### 3. Negligence

I find that Goodman has stated a claim for negligence. Unlike for the breach of fiduciary duty and negligent misrepresentation claims, here I find

12

that factual issues preclude dismissal at this stage and that the economic loss rule does not bar his claim.

Under New York law, "a plaintiff in tort must establish (1) that the defendant owed him or her a cognizable duty of care; (2) that the defendant breached that duty; and (3) that the plaintiff suffered damage as a proximate result of that breach." *Di Benedetto v. Pan Am World Serv., Inc.*, 359 F.3d 627, 630 (2d Cir. 2004). Both parties focus solely on the duty element.

The question, then, is whether UBS had a duty to accurately report tax information on the forms it provides to its clients. I find that it is not appropriate to reach a conclusion on the record before me and therefore decline to dismiss Goodman's negligence claim. This is admittedly a novel issue (Opp. at 37), and there are a number of factors that are relevant to determining what duty, if any, UBS owed to Goodman. Federal statutes and Treasury regulations, FINRA investigations, and standard industry practices may all come into play. This issue was not briefed in any great depth on the motion to dismiss and, in any event, the factual issues regarding UBS's policies and procedures need to be developed further after discovery. I thus find that it is not appropriate to grant a motion to dismiss on this fact-bound duty issue solely on the pleadings.

Finally, I address the economic loss rule. UBS argues that the economic loss rule compels the dismissal of Goodman's tort claims. (Mot. at 17.) Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated. *See, e.g., Clark–Fitzpatrick v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987); *Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012). Such a "legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract." *Id.* Where an independent tort duty is present, a plaintiff may maintain both tort and contract claims arising out of the same allegedly wrongful conduct. *See Hargrave v. Oki Nursery, Inc.*, 636

F.2d 897, 898–99 (2d Cir.1980) (citing *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 408 (1958)).

      Here, as noted above, I consider Goodman's tort Counts as pleaded in the alternative to his contract Counts. For the purposes of this count, I assume, *arguendo*, that the CRA does not address tax information reporting. I have already determined that UBS, potentially, has a duty of reasonable care to accurately report tax information. This potential duty is clearly "connected with and dependent on the [CRA]" but I find, on this record, that Goodman has alleged that the duty to accurately report tax information arises from "circumstances extraneous to" the CRA. *Bayerische Landesbank*, 692 F.3d at 58. It is true, of course, that Goodman's relationship with UBS is governed primarily by the CRA. It is nevertheless possible for such a duty to arise from an extraneous circumstance, for example industry standards or federal statutes. I thus conclude that, at this stage, the economic loss rule does not bar Goodman's claims and decline to dismiss Count 5.

## IV.   CONCLUSION

      For the reasons set forth above, UBS's motion to dismiss (DE 13) is GRANTED in part and DENIED in part. Specifically, the motion is GRANTED with regard to Counts, 2, 3, 4, 6, and 7 but is DENIED with regard to Counts 1 and 5. A separate order will issue.

Dated: June 30, 2022

                                                  /s/ Kevin McNulty
                                       ————————————————
                                       **Hon. Kevin McNulty**
                                       **United States District Judge**